628 S.E.2d 902

**QUEEN'S GRANT II HORIZONTAL PROPERTY REGIME, Appellant–Respondent,**

v.

**GREENWOOD DEVELOPMENT CORPORATION, d/b/a Palmetto Dunes Resort, Inc., Respondent–Appellant.**

**No. 4101.**

Court of Appeals of South Carolina.

Heard Jan. 10, 2006.
Decided April 10, 2006.

See also 286 S.C. 555, 335 S.E.2d 365.

344

346

348

Edward E. Bullard, of Hilton Head Island, for Appellant–Respondent.

Joseph R. Barker, of Hilton Head Island, for Respondent–Appellant.

KITTREDGE, J.:

We are presented with cross-appeals involving the Queen's Grant II Horizontal Property Regime on Hilton Head Island in Beaufort County, South Carolina. Queen's Grant II is part of a series of horizontal property regimes in a resort known as Palmetto Dunes. Queen's Grant II appeals from an order dismissing two of its three causes of action. On appeal, Queen's Grant II limits its challenge to the dismissal of its claim for prospective declaratory relief regarding the efficacy of an amendment to restrictive covenants concerning assessments for maintenance in Palmetto Dunes. Greenwood Development Corporation, the owner of Palmetto Dunes, appeals: (1) from the denial of its motion for summary judgment as to Queen's Grant II's claim for breach of contract for failure to repair a road within the Queen's Grant II regime; and (2) from the denial of its motion for attorney fees and costs. We affirm in result in part and reverse in part with respect to the dismissal of Queen's Grant II's declaratory judgment claim. We affirm the denial of Greenwood Development's motion for attorney fees and costs. We elect not to entertain, and thus dismiss, Greenwood Development's interlocutory appeal from the denial of its summary judgment motion, and we remand.[1]

■ Although this case involves many issues, primarily related to restrictive covenants and tangentially to horizontal

---

1. Judge Thomas Kemmerlin presided over all motions except Greenwood Development's request for attorney fees and costs. On Judge Kemmerlin's retirement, Judge Curtis L. Coltrane was assigned to hear the motion for fees and costs.

property law, the essence of our holding is that a developer may reserve to himself, in his sole discretion, the right to amend restrictive covenants running with the land or impose new restrictive covenants running with the land, provided five conditions are met: (1) the right to amend the covenants or impose new covenants must be unambiguously set forth in the original declaration of covenants; (2) the developer, at the time of the amended or new covenants, must possess a sufficient property interest in the development; (3) the developer must strictly comply with the amendment procedure as set forth in the declaration of covenants; (4) the developer must provide notice of amended or new covenants in strict accordance with the declaration of covenants and as otherwise may be provided by law; and (5) the amended or new covenants must not be unreasonable, indefinite, or contravene public policy.

## FACTS / PROCEDURAL HISTORY

### I.

Palmetto Dunes is a real estate resort development that includes multiple horizontal property regimes located on Hilton Head Island in Beaufort County, South Carolina. The development consists of various single and multi-family residences, commercial establishments, and resort facilities. The initial developer of Palmetto Dunes was Palmetto Dunes Resort, Inc. (Palmetto Dunes Resort), a subsidiary of Phipps Land Company, Inc.

Between 1968 and 1972, Palmetto Dunes Resort filed and recorded various covenants relating to contemplated single-family and multi-family developments throughout Palmetto Dunes. The Declaration of Covenants,[2] recorded in 1972, sets forth various rights, conditions, and restrictions concerning "all multi-family dwelling areas within Palmetto Dunes," in-

---

2. The document containing the 1972 Covenants is entitled "DECLARATION OF RIGHTS, RESTRICTIONS, CONDITIONS, ETC., WHICH CONSTITUTE COVENANTS RUNNING WITH CERTAIN LANDS OF PALMETTO DUNES RESORT, INC." It was recorded on September 13, 1972, in the office of Register of Deeds for Beaufort County in Deed Book 201 at page 1522. We refer to this document as the Declaration of Covenants or the 1972 Covenants.

cluding "lands conveyed in the future in Palmetto Dunes." The Queen's Grant II Horizontal Property Regime became subject to the Declaration of Covenants when it was created in 1974. The 1972 Covenants imposed restrictions throughout Palmetto Dunes, including, for example, covenants respecting ocean front property, lagoons, ponds, lakes, and golf courses.

Under the 1972 Covenants, Palmetto Dunes Resort agreed to maintain "community areas" in the resort, but only to the extent "such maintenance and services can be provided with the proceeds." Such services were to be funded by assessing all multi-family unit owners in the resort. Paragraph 22 of the 1972 Covenants provided:

In order to provide a permanent fund to maintain, landscape and repair private streets (except those located within a privately owned lot), walkways and like community areas, maintain the beachfront, lagoons and other bodies of water in a clean and orderly condition, provide for pest control when needed and in general provide those services important to the development and preservation of an attractive community appearance, and further, to maintain the privacy, security and general safety of the residential communities in Palmetto Dunes, each owner of a multi-family dwelling unit shall pay annually to [Palmetto Dunes Resort] the sum of Sixty ($60.00) Dollars per residential unit, said sum to be placed in an account and to be used exclusively for the purposes hereinabove noted. From and after January 1, 1974, this annual payment may be increased each year by the percentage of increase in the consumer price index for the previous year, or at the option of [Palmetto Dunes Resort] may be increased each year up to five (5) percent of the maximum authorized payment for the previous year.

Queen's Grant II (Queen's Grant) is one of the multi-family horizontal property regimes within Palmetto Dunes. Queen's Grant consists of 81 condominium units and comprises just a small part of Palmetto Dunes. Queen's Grant was created in 1974 when Palmetto Dunes Resort recorded a master deed (Master Deed) subjecting the property to the South Carolina Horizontal Property Act, S.C.Code Ann. §§ 27–31–10 to 300 (1991 & Supp.2005).[3] The Master Deed provides for the

---

3. The Master Deed was recorded on June 24, 1974, in the office of Register of Deeds for Beaufort County in Deed Book 221 at page 1327.

administration of the Queen's Grant regime in accordance with its bylaws.

The Master Deed references the 1972 Covenants and provides that "nothing contained [in the Master Deed] shall limit the rights of Palmetto Dunes Resort, Inc., its successors or assigns, as set forth in the aforesaid Declaration." The Declaration of Covenants reserved to Palmetto Dunes Resort, or its successors, the right to modify or impose additional covenants at any time in its sole discretion. The Declaration of Covenants further provided that any modifications to prior covenants would apply only to units sold after the amended covenants were recorded. Additionally, the Declaration of Covenants reserved to Palmetto Dunes Resort a thirty-day right of repurchase ("at the same price at which the highest bona-fide offer has been made for the property") in the event any unit owner should decide to sell.

Queen's Grant, as a multi-family dwelling area within Palmetto Dunes, was subject to the assessments under the 1972 Covenants to fund Palmetto Dunes Resort's maintenance obligations throughout the resort. Additionally, the Master Deed creating Queen's Grant and the regime's bylaws assign to Queen's Grant the responsibility for the maintenance of the property within its regime.[4] The bylaws created the "Council of Co-Owners," consisting of the unit owners within the Queen's Grant regime. The Council, in turn, is governed by a "Board of Administration."[5] This Board, on behalf of the regime, has many duties, including the "[c]ollection of assessments from the co-owners ... [and the] [c]are, upkeep and surveillance of the [Queen's Grant] Property and the Common

---

4. In a prior action involving these (and other) parties, the Queen's Grant regimes brought suit for construction defects in common elements of the regimes. The trial court dismissed the action, finding the regimes lacked standing. The supreme court reversed and found the regimes had standing, noting that the master deeds and bylaws imposed on the regimes the duty of maintaining the common elements. *Queen's Grant Villas Horizontal Prop. Regimes I–V v. Daniel Int'l Corp.*, 286 S.C. 555, 556, 335 S.E.2d 365, 366 (1985) ("A property regime has standing to bring an action for construction defects in common elements that the regime has the duty to maintain.").

5. The Board, per the bylaws, had to be composed entirely of unit owners within the regime once all apartments were conveyed. The last unit within Queen's Grant was sold in 1977.

Elements." The bylaws further authorize the imposition of "periodic assessments" on "[a]ll co-owners" to meet all regime "common expenses." Queen's Grant thus is obligated to perform within its regime "[a]ll maintenance, repair and replacement to the common elements as defined in the Master Deed." The Master Deed defines the "common elements" broadly to include virtually every aspect of regime maintenance, including "the land on which the Apartments are constructed, ... [p]arking facilities located on the Property, ... [and][a]ll roads, walkways [and] paths."

Palmetto Dunes Resort conveyed the last of the units in Queen's Grant in 1977. In 1979, Palmetto Dunes Resort (through its parent company, Phipps Land Development) was sold to Greenwood Development, an unaffiliated company. As successor in interest, Greenwood Development continued under the name "Palmetto Dunes Resort" and acquired all rights of its predecessor, including those under the 1972 Covenants.

Greenwood Development determined the assessments under the 1972 Covenants were insufficient to fund its maintenance duties throughout the resort. Greenwood Development, in the exercise of its right to amend the covenants, consequently recorded amended covenants in 1981—the 1981 Covenants [6]—applicable to all multi-family dwelling areas in Palmetto Dunes.[7] Tracking language from the 1972 Covenants, Greenwood Development made the 1981 Covenants applicable "to lands conveyed in the future in Palmetto Dunes by deeds or other instruments hereafter made which make reference to this Declaration of Covenants." The 1981 Covenants are substantially similar to the 1972 Covenants, but the 1981

6. The document containing the 1981 Covenants is entitled "DECLARATION OF RIGHTS, RESTRICTIONS, CONDITIONS, ETC., WHICH CONSTITUTE COVENANTS RUNNING WITH CERTAIN LANDS WITHIN PALMETTO DUNES RESORT." The document is subtitled, "CONSOLIDATED MULTI–FAMILY RESIDENTIAL COVENANTS OF GREENWOOD DEVELOPMENT CORPORATION." It was recorded on January 19, 1981, in the office of Register of Deeds for Beaufort County in Deed Book 314 at page 505. We refer to this document as the 1981 Covenants.

7. We recognize that the Limited Covenants, recorded in 1982, apply only to single-family residential units and thus are inapplicable to the present dispute. It appears Queen's Grant initially challenged the 1982 Covenants, confusing them with the 1981 Covenants.

Covenants increase the annual maintenance assessment. Article IV of the 1981 Covenants provides, in relevant part:

> In order to provide a permanent fund to maintain, landscape and repair private streets (except those located within a privately owned lot), walkways and like community areas, maintain the beachfront, lagoons and other bodies of water in a clean and orderly condition, repair damage caused by beach erosion, provide for pest control when needed and in general provide those services important to the development and preservation of an attractive community appearance, and further, to maintain the privacy, security and general safety of the residential communities in Palmetto Dunes Resort, each owner of a multi-family dwelling unit shall pay annually to Greenwood the sum of Two Hundred ($200.00) Dollars per multi-family unit or apartment, said sum to be placed in an account and to be used exclusively for the purposes hereinabove noted. From and after January 1, 1982, this annual payment may be increased each year by the percentage of increase in the Consumer Price Index for the previous year, or at the option of Greenwood may be increased each year up to ten (10%) percent of the maximum authorized payment for the previous year.

The 1981 Covenants left unchanged the proviso that the responsibility for maintenance and services is limited "to the extent such maintenance and services can be provided with the proceeds of the assessments." Greenwood Development's right of repurchase of the units was also left intact in the 1981 Covenants.

The 1981 Covenants—specifically the increased assessments-were applied to Queen's Grant units sold after the covenants were recorded. By 2002, all but fourteen Queen's Grant units had been transferred, and the new owners were being assessed at the higher rate. Beyond recording the 1981 Covenants, Greenwood Development additionally sought to target—provide actual notice of—the 1981 Covenants' application to individual units as they were sold by two methods: (1) by specific reference to and incorporation of the 1981 Covenants into deeds transferring title; and (2) by reference to the covenants or the increased assessments in waiver agreements (Waiver Agreements) signed by the new owners.

The Waiver Agreements were so named because they purported to waive Greenwood Development's preemptive right of repurchase under the covenants. However, both methods were not utilized in all cases. In some cases, only Waiver Agreements were utilized—referencing the 1981 Covenants or the higher rate of assessment—and in other cases, there was no Waiver Agreement, as only deeds provided notice of the 1981 Covenants. Regarding units sold and purchased after the recording of the 1981 Covenants, thirty-one units have deeds and Waiver Agreements referencing the 1981 Covenants; five units have only deeds that reference the 1981 Covenants; twenty-six units have Waiver Agreements that reference the 1981 Covenants; and five units "reference the higher assessment of the [1981 Covenants], but not the [1981 Covenants] themselves...."

## II.

This lawsuit arose from a dispute over responsibility for a $175 road repair invoice.[8] In December of 2000, Queen's Grant paid $175 for the road repair and demanded payment from Greenwood Development, but Greenwood Development refused. Queen's Grant then brought an action for breach of contract seeking to recover the $175. Queen's Grant expanded the dispute to challenge Greenwood Development's ability to amend the 1972 Covenants and enforce assessments under the 1981 Covenants; Queen's Grant sought a return to the lower assessment under the 1972 Covenants. This relief was sought in the form of a declaratory judgment that Greenwood Development lacked the authority to amend the covenants in 1981, and therefore each co-owner in the regime should be assessed in the future pursuant to the lower fee in the 1972 Covenants. The declaratory judgment claim—seeking only prospective relief—is an equitable claim. Finally, Queen's Grant sought a refund in an action at law of all assessments collected in excess of that due under the 1972 Covenants.

Greenwood Development filed two motions for summary judgment. The first motion requested summary judg-

---

8. This street is located in the Queen's Grant regime, but we are unable to determine its precise location from the record.

ment on Queen's Grant's first cause of action relating to the road repair. Greenwood Development's second motion sought summary judgment as to the second and third causes of action regarding the maintenance assessment. The circuit court issued an order granting Greenwood Development's second motion, but refused to grant its first motion.[9] The motions for reconsideration by both parties were denied. Greenwood Development's motion for attorney fees and costs was also denied.

Queen's Grant appeals only from the dismissal of its second cause of action seeking declaratory relief as to the unit owners' responsibility for future assessments under the 1981 Covenants. Greenwood Development cross-appeals, claiming the circuit court erred in two respects: (1) in failing to grant it summary judgment as to the breach of contract action concerning the road repair invoice; and (2) in failing to award it attorney fees and costs.

## STANDARD OF REVIEW

When reviewing the grant of a summary judgment motion, the appellate court applies the same standard that governs the circuit court under Rule 56(c), SCRCP. *Pittman v. Grand Strand Entm't, Inc.*, 363 S.C. 531, 536, 611 S.E.2d 922, 925 (2005). Summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Id.* On appeal, when factual matters are in dispute, all ambiguities, conclusions, and inferences arising in and from the evidence must be viewed in a light most favorable to the non-moving party. *Id.* However, when the facts are not in dispute, the question before the court is one of law. *Dawson v. S.C. Power Co.*, 220 S.C. 26, 32, 66 S.E.2d 322, 325 (1951) (holding that when only one

---

9. Queen's Grant asserts that it withdrew its cause of action for a refund of allegedly excessive assessments under the 1981 Covenants before the circuit court issued its ruling. There is nothing in the record to support this assertion. Queen's Grant continued to oppose the dismissal of this cause of action, even after the circuit court granted summary judgment. The circuit court's ruling as to the assessment refund is the law of the case.

reasonable inference can be drawn from a contested issue of fact, the question becomes one of law for the court).

## LAW/ANALYSIS

### I.

### *Queen's Grant's Appeal*

■ Queen's Grant acknowledges it has maintenance responsibilities on two fronts: (1) the payment of assessments to Palmetto Dunes Resort for maintenance of Palmetto Dunes' properties beyond its regime; and (2) the maintenance of its own regime property, including the common elements. Queen's Grant's appeal does not involve its maintenance obligations within its regime. *See* S.C.Code Ann. § 27–31–190 (1991) (providing that each co-owner must contribute toward the maintenance of the regime common areas). Queen's Grant further does not challenge the obligation of its owners (as originally imposed in the 1972 Covenants) to pay to Greenwood Development assessments for maintenance of the common areas beyond the Queen's Grant regime.[10] Queen's Grant simply wants to limit those assessments to the rate as established in the 1972 Covenants. Queen's Grant, therefore, appeals from the entry of summary judgment dismissing its second cause of action seeking a declaratory judgment that all unit owners in the regime be assessed prospectively at the lower rate under the 1972 Covenants.

Although the circuit court concluded the 1981 Covenants are valid, a review of the order granting summary judgment reveals that the circuit court primarily based its decision on the equitable doctrines of estoppel and laches.[11]

---

**10.** Covenants that require property owners to pay to a developer or homeowners' association assessments that have a beneficial effect on the value of the owners' properties touch and concern land and therefore "run with the land." *Harbison Cmty. Assoc., Inc. v. Mueller*, 319 S.C. 99, 102, 459 S.E.2d 860, 862 (Ct.App.1995). It is undisputed that the assessments under the respective covenants to fund Greenwood Development's maintenance obligations of Palmetto Dunes "run with the land."

**11.** The circuit court's discussion regarding the statute of limitations applies only to the claim for a refund of assessments, which was asserted as an action at law seeking damages.

## A. Circuit Court's Grant of Summary Judgment

### 1. Estoppel

■■ "Estoppel arises when a party, relying upon what another has said or done, changes his position to his detriment." *Gibbs v. Kimbrell,* 311 S.C. 261, 268, 428 S.E.2d 725, 729 (Ct.App.1993). A claim of estoppel includes elements for the party asserting estoppel and the party estopped. *E.g., Provident Life and Accident Ins. Co. v. Driver,* 317 S.C. 471, 477, 451 S.E.2d 924, 928 (Ct.App.1994) (listing the elements of equitable estoppel: as to the estopped party, a misrepresentation or nondisclosure, intent to induce the other party to act, and actual or constructive knowledge of the true facts; and as to the party claiming estoppel, lack of knowledge, or means of acquiring knowledge of the true facts, reasonable reliance, and prejudicial change of position).

■ As the circuit court found, it is a well-established principle in South Carolina that estoppel by silence arises when one party observes another dealing with his property in a manner inconsistent with his rights and makes no objection while the other party changes his position based on the party's silence. *Seabrook Island Property Owners Association v. Pelzer,* 292 S.C. 343, 356 S.E.2d 411 (Ct.App.1987), supports the circuit court's adoption of Greenwood Development's estoppel defense as to Queen's Grant's now-abandoned refund claim. In *Pelzer,* the owners' association sued to collect an unpaid annual assessment. *Id.* at 345, 356 S.E.2d at 412. The landowner counterclaimed and sought a refund of assessments paid for the years 1976 through 1983 on the basis that the assessment was invalid. *Id.* This court found in favor of the landowner in that the assessment violated the applicable restrictive covenants and bylaws, yet the court concluded the landowner was not entitled to a refund of the excess assessments paid in prior years. *Id.* at 348, 356 S.E.2d at 414. The landowner's inability to recover the excessive assessments rested in his estoppel by silence. As the court observed:

> [Pelzer] acquiesced in the method of assessment and paid the charges. The Association expended the moneys for purposes authorized by the by-laws. Pelzer received the benefit of those expenditures. He cannot now return the benefits or restore the Association to its former posi-

tion.... If a party stands by and sees another dealing with his property in a manner inconsistent with his rights and makes no objection while the other changes his position, his silence is acquiescence and it estops him from later seeking relief.

*Id.*

■ The *Pelzer* court's treatment of the estoppel defense clearly applies to Queen's Grant's efforts in the trial court to recover allegedly excessive assessments for the past two decades, a claim now abandoned. But the estoppel defense does not summarily dispose of the declaratory judgment claim of Queen's Grant for prospective relief. There are genuine issues of material fact concerning the application of estoppel to these facts. For example, the record does not support a finding as a matter of law that Greenwood Development would be prejudiced by an adverse ruling in the declaratory judgment cause of action (that the assessments under the 1981 Covenants were not authorized), thereby requiring future assessments under the 1972 Covenants. In this regard, both the 1972 Covenants and 1981 Covenants provide that Greenwood Development is responsible for providing services only to the extent the funds from unit owners covered such services. Because the element of detrimental reliance may be lacking (as well as other elements), the estoppel defense does not entitle Greenwood Development to summary judgment on the declaratory judgment cause of action.

### 2. Laches

■■ The circuit court alternatively found that laches bars Queen's Grant's declaratory judgment cause of action seeking only prospective relief. " 'Laches' is defined as 'neglect for an unreasonable and unexplained length of time, under circumstances affording opportunity for diligence, to do what in law should have been done.' " *Gordon v. Drews,* 358 S.C. 598, 612, 595 S.E.2d 864, 871 (Ct.App.2004) (quoting *Muir v. C.R. Bard, Inc.,* 336 S.C. 266, 296, 519 S.E.2d 583, 598 (Ct.App.1999)). "Delay alone is not enough to constitute laches; it must be unreasonable, and the party asserting laches must show prejudice." *Gordon,* 358 S.C. at 612, 595 S.E.2d at 871 (quoting *Brown v. Butler,* 347 S.C. 259, 265, 554 S.E.2d 431, 434 (Ct.App.2001)).

■ We again confront the circuit court's blanket finding of prejudice against Greenwood Development, a finding in which Greenwood Development may seek refuge only as to the claim for a refund of past assessments. For the same reason the circuit court could not properly find estoppel and grant Greenwood Development summary judgment as to the claim for prospective relief, the court erred in relying alternatively on laches to dismiss the declaratory judgment cause of action.

### 3. The Validity of the 1981 Covenants

We now turn to the merits of Queen's Grant's challenge to the validity of the 1981 Covenants. The circuit court in its conclusions of law ruled that "the assessment imposed under the [1981] Covenants is, as a matter of law, a valid assessment imposed pursuant to Greenwood Development's rights, as a successor and assign of [Palmetto Dunes Resort], pursuant to the plain and unambiguous provisions of the [1972] Covenants permitting the amendment of the [1972] Covenants." We concur with the circuit court, with the exception of five units in Queen's Grant.

In South Carolina, an owner of a fee or leasehold interest in certain real property may declare the property to be subject to a horizontal property regime. S.C.Code Ann. § 27–31–30 (Supp.2005). The term horizontal is a misnomer, for a "condominium is actually a vertical property regime composed of horizontal slices of airspace ... within the vertical column." *Sea Watch Stores Ltd. Liab. Co. v. Council of Unit Owners of Sea Watch Condo.*, 115 Md.App. 5, 691 A.2d 750, 753 n. 1 (1997). When land is submitted to a horizontal property regime, no new property is created, even though the structure as completed may include many floors of condominium units. *Id.* at 753. Instead, condominium statutes, like South Carolina's Horizontal Property Act, merely created a new way to own and regulate airspace. *Id.* Condominium apartments may be bought and sold like real property. *See* S.C.Code Ann. §§ 27–31–40 and 60 (1991). Ownership in a condominium may be subject to deed restrictions and covenants like any other real property. *See Sea Watch*, 691 A.2d at 753–54.

The creation of a horizontal property regime is accomplished through compliance with the South Carolina Horizon-

tal Property Act. Section 27–31–40 of the South Carolina Code provides that once property is submitted to a condominium horizontal property regime, individual apartments may be owned, conveyed and encumbered independently of other apartments, subject to the same general principles of law governing real property. *See* 4 S.C. Jur. *Condominiums* § 9 (2005). Apartments, for horizontal property purposes, are defined in section 27–31–20(a) (1991) as "a part of the property intended for any type of independent use . . . including one or more rooms or enclosed spaces. . . ." Each "co-owner," or owner of an apartment in a regime, acquires "condominium ownership," and owns his or her individual apartment, and has a common right to share, with other co-owners, in the common areas of the property. S.C.Code Ann. § 27–31–20(c) and (d) (Supp.2005); § 27–31–60.

 Property, whether subject to the Horizontal Property Act, may, of course, be governed by restrictive covenants. Real covenants have been defined as "agreement[s] . . . to do, or refrain from doing, certain things with respect to real property." 20 Am.Jur.2d *Covenants, Conditions, and Restrictions* § 1 (2005). Therefore, covenants, "in a sense are contractual in nature and bind the parties thereto in the same manner as would any other contract." *Id.* (citing *Seabrook Island Prop. Owners Assoc. v. Pelzer*, 292 S.C. 343, 356 S.E.2d 411 (Ct.App.1987)). Restrictive covenants are construed like contracts and may give rise to actions for breach of contract. 17 S.C. Jur. *Covenants* § 2 (2005) (citing *Hoffman v. Cohen*, 262 S.C. 71, 202 S.E.2d 363 (1974) and *Manning v. City of Columbia*, 297 S.C. 451, 377 S.E.2d 335 (1989)). However, restrictive covenants affecting real property cannot be properly and fully understood without resort to property law.

 Restrictive covenants differ from contracts in that they "run with the land," meaning that they are enforceable by and against later grantees. 17 S.C. Jur. *Covenants* § 18 (2005). Restrictive covenants that require grantees to pay assessments for the upkeep of a particular parcel of property are held to be real covenants which "touch and concern" land, and therefore, run with the land. *Epting v. Lexington Water Power Co.*, 177 S.C. 308, 314–317, 181 S.E. 66, 69–70 (1935); 17 S.C. Jur. *Covenants* §§ 18 and 19.

There are several ways in which restrictive covenants may be created. The most common means are: (1) by deed; (2) by declaration; and (3) by implication from a general plan or scheme of development. 17 S.C. Jur. *Covenants* § 60. The initial restrictive covenants applicable to Palmetto Dunes were created by the Declaration of Covenants when Palmetto Dunes Resort executed and recorded the 1972 Covenants. *See Smith v. Comm'rs of Pub. Works of City of Charleston,* 312 S.C. 460, 466, 441 S.E.2d 331, 335 (Ct.App.1994); 17 S.C. Jur. *Covenants* § 8.

Restrictive covenants will be enforced unless they are indefinite or contravene public policy. *Sea Pines Plantation Co. v. Wells,* 294 S.C. 266, 270, 363 S.E.2d 891, 894 (1987). Moreover, a developer may generally reserve to himself the right to amend restrictive covenants in his sole discretion, and may do so without the consent of the grantee, so long as he exercises that right in a reasonable manner. *Flamingo Ranch Estates, Inc. v. Sunshine Ranches Homeowners, Inc.,* 303 So.2d 665, 666 (Fla.Dist.Ct.App.1974) (citing *Johnson v. Three Bays Props. No. 2, Inc.,* 159 So.2d 924, 925 n. 1 (Fla.Dist.Ct.App.1964)), *cited with approval in Wright v. Cypress Shores Dev. Co., Inc.,* 413 So.2d 1115, 1123–24 (Ala. 1982); *Rossman v. Seasons at Tiara Rado Assocs.,* 943 P.2d 34, 37 (Colo.Ct.App.1996); *Markey v. Wolf,* 92 Md.App. 137, 607 A.2d 82, 94 (1992); *Appel v. Presley Cos.,* 111 N.M. 464, 806 P.2d 1054, 1056 (1991); *Scoville v. SpringPark Homeowner's Assoc., Inc.,* 784 S.W.2d 498, 509 n. 7 (Tex.App.1990); *Lakemoor Cmty. Club, Inc. v. Swanson,* 24 Wash.App. 10, 600 P.2d 1022, 1025 (1979).[12] However, when a subdivision developer is divested of all interest in the subdivision, a reserved

---

**12.** In the area of condominium and property regime law, Florida case law is cited approvingly in jurisdictions throughout the country. Indeed, when faced with unresolved questions in horizontal property law, courts often look to Florida law. *See* Douglas Scott MacGregor, *South Carolina Condominium Law* § 1.01 (William S. Jula ed. 1986) ("Florida is the undisputed leader in the development of condominium law, and its cases are frequently cited in other states and are generally considered to have persuasive value."). Queen's Grant does not challenge the general right of Greenwood Development to amend the 1972 Covenants; Queen's Grant's challenge in this regard is limited to the claim that the 1981 amendments are ineffective as to its co-owners because the last Queen's Grant unit was sold in 1977.

right to amend restrictive covenants is extinguished. *Armstrong v. Roberts,* 254 Ga. 15, 325 S.E.2d 769, 770 (1985). Additionally, when a developer fails to expressly reserve a right to amend the covenants, amendments are not allowed. *Heritage Fed. Sav. & Loan Ass'n v. Eagle Lake & Golf Condos.,* 318 S.C. 535, 541, 458 S.E.2d 561, 565 (Ct.App.1995); *Shipyard Prop. Owners' Assoc. v. Mangiaracina,* 307 S.C. 299, 414 S.E.2d 795 (Ct.App.1992).

■ The centerpiece of Queen's Grant's Complaint and appeal is its challenge to the amended covenants in 1981, specifically the increased assessment to fund Greenwood Development's maintenance obligations. Queen's Grant presses three arguments in its effort to invalidate the 1981 Covenants and return to lower assessments under the 1972 Covenants. First, because all units in the Queen's Grant regime had been sold prior to Greenwood Development's acquisition of Palmetto Dunes in 1979, Greenwood Development "cannot impose covenants/restrictions on property that it does not own." Final Appellant's brief of Appellant–Respondent at 19. Second, because the Master Deed of "Queens Grant II makes no reference to the 1981 Covenants, ... [t]he 1981 Covenants are therefore void." *Id.* at 18–19. Third, the 1981 Covenants may not be sanctioned pursuant to the so-called Waiver Agreements for a variety of reasons, primarily grounded in contract law principles and the claim that the preemptive repurchase right reserved to the Declarant[13] violates the rule against perpetuities. *Id.* at 22.

### a. All Condominium Units in the Queen's Grant Regime Were Sold Prior to Greenwood Development's Acquisition of Palmetto Dunes

■ Queen's Grant argues that Greenwood Development lacked authority to amend the restrictive covenants because it bought Palmetto Dunes after all the units in the Queen's Grant regime had been sold, and thus Greenwood Develop-

---

13. The term "declarant" is often used in documents related to restrictive covenants and the creation of horizontal property regimes, as well as the corresponding rights and responsibilities of an owner-developer. In the context of horizontal property law, a declarant is "a grantor that establishes or joins in the creation of a declaration of condominium." 15A Am.Jur.2d *Condominiums* § 1 (2005).

ment "cannot impose covenants/restrictions on property that it does not own." This argument is unavailing, for Queen's Grant misapprehends the *purpose* of the assessment under the 1972 Covenants and the 1981 Covenants, as well as Greenwood Development's unquestioned ownership of property within Palmetto Dunes. The assessment at issue relates to Greenwood Development's maintenance responsibilities in the resort well beyond the confines of Queen's Grant. Greenwood Development's lack of a direct ownership interest in the property of Queen's Grant in no manner impedes its continuing rights as Declarant under the 1972 Covenants, including its ability to amend the covenants. As noted, Palmetto Dunes does not merely consist of a single horizontal property regime, and Queen's Grant comprises just a small part of Palmetto Dunes.

Queen's Grant asks us to follow the rule that a developer of a subdivision who reserves authority respecting restrictive covenants running with the land loses that authority when he divests himself of his interest in the subdivision. *Armstrong v. Roberts*, 254 Ga. 15, 325 S.E.2d 769, 770 (1985). This rule has no application here, for Greenwood Development maintains a substantial interest in Palmetto Dunes. Queen's Grant's narrow view—limiting the analysis to the confines of its regime—is myopic and fails to recognize Greenwood Development's interest in Palmetto Dunes and its corresponding obligation to maintain resort properties far beyond the Queen's Grant regime. The unchallenged 1972 Covenants and the challenged 1981 Covenants relate to Greenwood Development's maintenance responsibilities for resort property (beyond the confines of the Queen's Grant regime) in which it clearly does have an ownership interest.

Moreover, Greenwood Development's predecessor, Palmetto Dunes Resort, reserved the right to amend the restrictive covenants in its sole discretion. Palmetto Dunes Resort owned the development at the time the original covenants were recorded, including rights in the property such as easements, right of ways, and lands held in trust within each regime. Greenwood Development acquired all Palmetto Dunes Resort's rights and obligations when it purchased the development. Palmetto Dunes Resort's interest in Palmetto Dunes did not evaporate when the last unit in Queen's Grant was sold. We conclude as a matter of law that Palmetto

Dunes Resort had an interest in the property of Palmetto Dunes when it sold its interest to Greenwood Development. Greenwood Development acquired that property interest. Accordingly, the sale of all units in the Queen's Grant regime prior to Greenwood Development's 1979 purchase did not foreclose its right to amend the 1972 Covenants.

### b. The Master Deed

■■■ We next address whether the failure of the Master Deed to reference the 1981 Covenants renders those covenants void. Queen's Grant's challenge here focuses on the Horizontal Property Act.[14] The Act requires a master deed. S.C.Code Ann. §§ 27–31–20(i), 27–31–30, and 27–31–100. The Act requires that the master deed include a comprehensive list of particulars, including a "description of the full legal rights and obligations, both currently existing and which may occur, of the apartment owner, the co-owners, and the person establishing the regime." S.C.Code Ann. § 27–31–100(f). It is Queen's Grant's contention that for restrictive covenants to be enforceable against unit owners in a regime under the Act, those covenants must be expressly included in the Master Deed. According to Queen's Grant, "the 1972 Covenants are the only valid covenants that are binding upon the co-owners of the Queens Grant II regime." (Final Appellant's brief of Appellant–Respondent, 18–19). Queen's Grant further points to the language in the Master Deed that its "provisions [shall not be] amended unless all of the co-owners and the mortgag-

---

14. We note that the Horizontal Property Act may not be controlling here (at least not exclusively) because Greenwood Development's maintenance obligations under the 1972 Covenants and 1981 Covenants do not relate to the regime property of Queen's Grant; as noted, these obligations relate to resort property outside of the Queen's Grant regime. Because the covenants concern responsibility for maintenance of resort property beyond the Queen's Grant regime, Greenwood Development is akin to a "master association" and is not subject to the Horizontal Property Act with regard to such property. *See Scott v. Sandestin Corp.*, 491 So.2d 334 (Fla.Dist.Ct.App.1986). Courts in other jurisdictions have recognized that assessments by master associations for maintenance of property outside the regime are separate from assessments by the condominium association for maintenance of its own common elements. *Hobson v. Hilltop Place Cmty. Assoc.*, 122 N.H. 1023, 453 A.2d 841, 842 (1982).

ees of all the mortgages covering the Apartments unanimously agree to such ... amendment." [15]

To the extent the covenants may be governed by the Act, we believe Queen's Grant reads section 27–31–100(f) too narrowly, and fails to consider critical provisions of the Master Deed, as well as other sections of the Act. Paragraph SIXTEENTH of the Master Deed provides in part:

[E]ach co-owner shall comply with the provisions of this Master Deed and authorized amendments thereto, the Declaration of Covenants, ... applicable to all Multi–Family Residential Areas in Palmetto Dunes ... and the Regime By-laws ... *provided that nothing contained herein shall limit the rights of Palmetto Dunes Resort, Inc., its successors and assigns, as set forth in the aforesaid Declaration.*

(Emphasis added).

It was not necessary to amend the Master Deed for the 1981 Covenants to apply to units sold thereafter when the subsequent purchasers received notice of the 1981 Covenants in the manner prescribed by those covenants. The Master Deed therefore, as a matter of law, satisfies general principles of property law, including the requirement of the Act—section 27–31–100(f)—that the master deed include a "description of the full legal rights and obligations, both currently existing and which may occur, of the apartment owner, the co-owners, and the person establishing the regime." *Cf.* Douglas Scott MacGregor, *South Carolina Condominium Law* § 2.04(C) (S.C. Bar Assoc. 2000) ("The SCHPA[,] unlike most condominium acts, has no requirements regarding the placement of use restrictions.").

This finding comports with other provisions of the Act. Section 27–31–170, for example, allows for the inclusion of restrictive covenants outside of a master deed: "Each co-owner shall comply strictly ... with the covenants, conditions and restrictions set forth in the master deed or lease *or in the deed or lease to his apartment.*" (Emphasis added). The

---

**15.** *Cf. Heritage Fed. Sav. & Loan Ass'n v. Eagle Lake & Golf Condos.,* 318 S.C. 535, 541, 458 S.E.2d 561, 565 (Ct.App.1995) (holding a regime developer has the authority to amend the master deed without the consent of property owners so long as the developer specifically reserves that right in the master deed).

emphasized language of this statute refutes Queen's Grant's interpretation of section 27–31–100(f) that only covenants expressly referenced in a master deed are enforceable. We hold that because the Master Deed reserves all rights under the Declaration of Covenants, section 27–31–170 permits the inclusion of lawfully amended covenants in individual Queen's Grant deeds. *Heritage Fed. Sav. & Loan Assoc.*, 318 S.C. at 541, 458 S.E.2d at 565 ("S.C.Code Ann. § 27–31–100(f) permits a developer to reserve certain rights provided he states those rights with specificity in the master deed."). This lines up with the triggering language in the 1981 Covenants [16] that the covenants would apply to multi-family dwellings conveyed in the future (following the recording of the covenants) "*by deeds* or other instruments hereafter made which make reference to this Declaration of Covenants." 1981 Covenants (emphasis added).

### c. The Waiver Agreements

We next turn to the Waiver Agreements as the basis for imposing the increased assessments on the unit owners in Queen's Grant. The 1981 Covenants provide the procedure for making the assessments applicable to multi-family dwellings "conveyed in the future." The 1981 Covenants apply to multi-family dwellings where the covenants are referenced "by deeds *or other instruments hereafter made which make reference to this Declaration of Covenants.*" 1981 Covenants (emphasis added). We begin with the premise that in construing restrictive covenants, ambiguities must be strictly construed against the party seeking to enforce them. *Sea Pines Plantation Co. v. Wells*, 294 S.C. 266, 270, 363 S.E.2d 891, 893–94 (1987); *Seabrook Island Prop. Owners Assoc. v. Marshland Trust, Inc.*, 358 S.C. 655, 662, 596 S.E.2d 380, 383 (Ct.App.2004). Greenwood Development chose the language by which the 1981 Covenants would become applicable to new unit owners. We find the award of summary judgment to Greenwood Development inappropriate where it failed to strictly comply with the method of notice it prescribed in the 1981 Covenants. There are five units in which Greenwood Development seeks to impose the increased assessments

---

16. The 1972 Covenants contain the same provision.

based solely on Waiver Agreements that do *not* reference the 1981 Covenants. Those units are 501, 523, 530, 533, and 544. We reverse the grant of summary judgment as to these five units. Beyond the technical noncompliance with the language in the 1981 Covenants (limiting applicability to "instruments ... which make reference to" the covenants), there remain unanswered questions. For example, the parties dispute whether the 1981 Covenants themselves are in the chain of title for units within Queen's Grant. We cannot answer this and other questions to the exacting summary judgment standard on the record before us.

 In those instances where Greenwood Development relies on the Waiver Agreements—which *do* reference the 1981 Covenants—to impose the increased annual assessment, we find the 1981 Covenants enforceable. Queen's Grant asserts the Waiver Agreements are "contracts" and are void for lack of consideration,[17] for lack of mutual assent and for violating the rule against perpetuities. We believe the matter is governed by property, not contract, law.

██ The issue is notice of the amended covenants (in accordance with the triggering language in the 1981 Covenants), not a bargained-for consideration to gain a purchaser's consent to the increased assessment. Consent is not an issue, for the Declaration of Covenants allows for amendments to the covenants in the sole discretion of the Declarant. This discretion is limited not by a prospective owner's objection or acquiescence to paying a higher assessment, but by the law—covenants must be neither indefinite nor contravene public policy. *Wells*, 294 S.C. at 270, 363 S.E.2d at 894; *accord Woodside Village Condo. Assoc., Inc. v. Jahren*, 806 So.2d 452, 461 (Fla.2002) (holding that unit owners were on notice that their rights were subject to change via properly adopted amendments); *McElveen–Hunter v. Fountain Manor Assoc., Inc.*, 96 N.C.App. 627, 386 S.E.2d 435, 436 (1989), *aff'd*, 328 N.C. 84, 399 S.E.2d 112 (1991) (holding that where the condo-

---

**17.** At common law, a "covenant" generally referred to a contract under seal. 20 Am.Jur.2d *Covenants, Conditions, and Restrictions* § 2 (2005). In South Carolina, some distinctions between contracts under seal and other contracts remain, such as the rule that a covenant under seal may not be set aside for lack of consideration in the absence of fraud. *Id.; Jackson v. Walters*, 246 S.C. 486, 493, 144 S.E.2d 422, 425 (1965).

minium documents so allow, occupancy and leasing restrictions in an amendment to the declaration may bind even unit owners who bought their units before the amendment was adopted). There is no claim by Queen's Grant that the 1981 Covenants are indefinite or contravene public policy. Moreover, Queen's Grant does not challenge the reasonableness of the assessment increase in 1981.

The final argument in connection with the Waiver Agreements is Queen's Grant's contention that the contingent, nonvested preemptive right to repurchase units (as reasserted in the 1981 Covenants) violates the rule against perpetuities. Queen's Grant concludes that the waiver of an unenforceable right cannot serve as valuable consideration to support the Waiver Agreements. According to the rule against perpetuities, a nonvested property interest is invalid unless "(1) when the interest is created, it is certain to vest or terminate no later than twenty-one years after the death of an individual then alive; or (2) the interest either vests or terminates within ninety years after its creation." S.C.Code Ann. § 27–6–20 (1991).[18] Nonvested property interests tend to restrain the free alienability of property and interfere with its beneficial use. 61 Am.Jur.2d *Perpetuities and Restraints on Alienation* § 6 (2005). This court has had occasion to invalidate a right of first refusal in a deed where the contingent, nonvested interest attempted to reserve to the holder of the preemptive right—the grantor—a perpetual option to repurchase the property for the original consideration. *Webb v. Reames*, 326 S.C. 444, 446–47, 485 S.E.2d 384, 385 (Ct.App.1997). Greenwood Development cites to numerous cases from other jurisdictions upholding repurchase provisions similar to that in the 1981 Covenants, and rejecting application of the rule against perpetuities, where the right to repurchase the property is for the same price the owner is willing to sell to a third party. *Weber v. Texas Co.*, 83 F.2d 807, 808 (5th Cir.1936), *Cambridge Co. v. East Slope Inv. Corp.*, 700 P.2d 537, 542 (Colo. 1985); *Shiver v. Benton*, 251 Ga. 284, 304 S.E.2d 903, 906–07 (1983); *cf.* S.C.Code Ann. § 27–6–60(B) (holding that under

---

18. The common law rule is as follows: "No interest is good unless it must vest, if at all, no later than twenty-one years after some life in being at the creation of the interest." *Abrams v. Templeton*, 320 S.C. 325, 327, 465 S.E.2d 117, 119 (Ct.App.1995).

the Uniform Statutory Rule Against Perpetuities, courts must reform a disposition that was created before July 1, 1987 by inserting a savings clause that preserves the transferor's plan of distribution "within the limits of the rule against perpetuities"). We decline to resolve this issue because there is no justiciable controversy surrounding the right of first refusal provision. This record is devoid of any attempt at any time by Greenwood Development to exercise its right of repurchase. *See Peoples Fed. Sav. & Loan Assoc. of S.C. v. Resources Planning Corp.,* 358 S.C. 460, 477, 596 S.E.2d 51, 60 (2004) ("Absent a pending sale or offer for sale, or purchase or offer to purchase, or the presence of a third party challenging right of first refusal, there is no justiciable controversy.") In any event, because we have determined that the Waiver Agreements served their intended notice function, we find Queen's Grant's various contract law based challenges misplaced.

While the Waiver Agreements may have been inartfully named, they did serve the purpose of giving each prospective owner notice of the applicability of the 1981 Covenants, even if those covenants were not in the grantee's deed. *Harbison Cmty. Assoc., Inc. v. Mueller,* 319 S.C. 99, 103, 459 S.E.2d 860, 863 (Ct.App.1995) ("A covenant is enforceable against a subsequent grantee, even if not in the grantee's deed, if the grantee has actual or constructive notice of the covenant."). As the record reflects, all but fourteen unit owners had notice of the increased assessments through references in their deeds or in the Waiver Agreements.[19] For those units in which Greenwood Development relies solely on the Waiver Agreements which reference the 1981 Covenants, the so-called agreements satisfied the triggering provision in the 1981 Covenants and served their intended notice function.

In sum, because the Declaration of Covenants reserved to Palmetto Dunes Resort, and hence Greenwood Development as successor, the right to amend the restrictive covenants, purchasers of units in the Queen's Grant regime accepted their respective deeds subject to this right. Excepting the five Queen's Grant units discussed above, we affirm the grant of summary judgment and reject the balance of Queen's

---

**19.** Greenwood Development has consistently assessed the fourteen remaining units at the lower rate included in the 1972 Covenants.

Grant's multiple challenges to the validity of the 1981 Covenants. The increased assessments under Article IV in the 1981 Covenants are enforceable, save the exception noted above.

## II.

### Greenwood Development's Appeal

Greenwood Development appeals from the denial of its motion for summary judgment as to the breach of contract claim concerning the road repair invoice and its motion for attorney fees and costs.

### A. Circuit Court's Denial of Summary Judgment

█ Although we may entertain appeals from interlocutory orders not ordinarily appealable when they are companion to reviewable issues,[20] we believe the purposeful decision of the circuit court to avoid any consideration of the motion dictates restraint. We dismiss Greenwood Development's appeal as interlocutory.

The circuit court order is not conducive to appellate review. The circuit court order is as follows:

The case comes before me upon [Greenwood Development's] well pled summary judgment motion, and when I read the motion, it was my first thought that I should grant

---

**20.** *Edge v. State Farm Mut. Auto. Ins. Co.*, 366 S.C. 511, 517, 623 S.E.2d 387, 390 (2005) (entertaining a discretionary appeal of a motion to dismiss in the interest of judicial economy because a related issue in a cross-appeal was properly before the court); *Brown v. County of Berkeley*, 366 S.C. 354, 362 n. 5, 622 S.E.2d 533, 538 n. 5 (2005) (holding that interlocutory orders may be considered on appeal when they are companion to reviewable issues, but finding the motions to dismiss unreviewable because they lacked a sufficient "nexus or companionship" to justify the exercise of immediate appellate review); *Morris v. Anderson County*, 349 S.C. 607, 610–11, 564 S.E.2d 649, 651 (2002) (holding that the appellate court may, as a matter of discretion, consider an unappealable order along with an appealable issue where such a ruling will avoid unnecessary litigation, but declining to address the appeal based on concerns of creating an impermissible advisory ruling); *Pitts v. Jackson Nat'l Life Ins. Co.*, 352 S.C. 319, 338, 574 S.E.2d 502, 511–12 (Ct.App.2002) (entertaining an appeal from a denial of summary judgment because it was so closely connected with other issues properly before the court).

the motion. However, after reading the cause of action attacked, I realized the case can probably be tried upon a submission of the record to me without testimony, so I see no need to grant summary judgment when it will be almost as simple to hear the case on the merits, so the Motion for Summary Judgment is denied.

Greenwood Development advances the following arguments on its appeal: (1) the circuit court erred in failing to grant summary judgment because the bylaws placed the obligation to maintain the roads on Queen's Grant; (2) the circuit court erred in failing to grant summary judgment because under the 1981 Covenants Greenwood Development has no obligation to maintain the roads; and (3) Queen's Grant's cause of action is barred by the statute of limitations and equitable estoppel. These arguments are not properly before this court because the circuit court has yet to rule on them.

We do recognize that the bylaws (by incorporation of the Master Deed) place on Queen's Grant the duty to maintain "[a]ll roads" within its regime. We further recognize that under the 1972 Covenants and 1981 Covenants, Greenwood Development is responsible for maintaining "private streets (except those located within a privately owned lot)." In its Complaint, Queen's Grant uses the term "private street" to describe the road that was repaired. As noted, we cannot determine the precise location of the "road" or "private street" which is the subject of Queen's Grant's breach of contract action. As urged by Greenwood Development, simply knowing the road is somewhere within the Queen's Grant regime may be dispositive. We believe it best, however, to have the circuit court, in the first instance, address this issue and determine if the road or street in question falls under Queen's Grant's duties under the Master Deed and bylaws or somehow is the responsibility of Greenwood Development under the applicable 1981 Covenants.

In order for an issue to be properly preserved for appeal, it must have been both raised to and ruled upon by the trial court. *Elam v. S.C. Dep't of Transp.*, 361 S.C. 9, 23–24, 602 S.E.2d 772, 779–780 (2004). Error preservation principles are intended to enable the trial court to rule after it has considered all relevant facts, law, and arguments. *Ellie, Inc.*

*v. Miccichi,* 358 S.C. 78, 103, 594 S.E.2d 485, 498 (Ct.App. 2004). The rationale for the rule is that until the trial court considers the matter and makes a ruling, an appellate court is unable to find error. *Id.* Issue preservation rules are designed to give the trial court a fair opportunity to rule on the issues, and thus provide us with a platform for meaningful appellate review.

This case well illustrates the wisdom of the rule. In the approximate 2700 page record of this case, not a single page can be found containing a transcript of any proceeding before the circuit court. Nothing in the record indicates the precise location of the road involved in the $175 repair. Moreover, while Greenwood Development asserts that Queen's Grant has assumed responsibility for maintaining this particular road, the circuit court purposely avoided addressing the substance of Greenwood Development's arguments. The appealed order clearly was not intended to be a final ruling on any of the issues Greenwood Development raises. The circuit court denied Greenwood Development's motion only for reasons of judicial economy, finding that a trial upon a submission of record would be the most efficient resolution. What Greenwood Development is asking this court to do is serve as a trial court in finding facts based upon the record as submitted. That, we decline to do.

We dismiss Greenwood Development's appeal from the denial of its summary judgment motion and remand to the circuit court for further proceedings.

## B. Denial of Motion for Attorney Fees and Costs

Greenwood Development's final argument on appeal is that the circuit court erred in refusing to award it attorney fees and costs. Construing the relevant language in the 1981 Covenants, the circuit court found that Queen's Grant did not violate the covenants by bringing its action.

"The general rule is that attorney's fees are not recoverable unless authorized by contract or statute." *Seabrook Island Prop. Owners' Assoc. v. Berger,* 365 S.C. 234, 238, 616 S.E.2d 431, 434 (Ct.App.2005). Greenwood Development relies solely on Section 7–10 of the 1981 Covenants to

support its claim for attorney fees and costs. That provision provides:

> *Enforcement.* Greenwood shall have the right, but shall not be obligated, to proceed at law or in equity to complete compliance to the terms of this Agreement or to prevent violation or breach in any event. Violators shall be personally obligated to reimburse Greenwood in full for all its direct and indirect costs, including, but not limited to, legal fees incurred by Greenwood in maintaining compliance with this declaration, and such obligation shall constitute a lien upon the violator's property in accordance with Section 8–8.

The question presented is whether Queen's Grant may be considered a "violator" in filing and pursuing its Complaint, primarily seeking prospective declaratory relief.

Greenwood Development contends that Queen's Grant is a "violator" by seeking a declaratory judgment that its co-owners should be assessed under the 1972 Covenants, rather than the 1981 Covenants, and further seeking reimbursement of alleged past overages. "Violator" is not a defined term in the 1981 Covenants. Greenwood Development asserts that by bringing a legal action, Queen's Grant has "flown in the face of" the 1981 Covenants. "Violation" has been defined, in relevant part, as "1. An infraction or breach of the law; a transgression.... 2. The act of breaking or dishonoring the law; a contravention of a right or duty." Black's Law Dictionary (8th ed.2004).

In interpreting restrictive covenants, ambiguities must be strictly construed against the party seeking to enforce them. *Sea Pines Plantation Co. v. Wells,* 294 S.C. 266, 270, 363 S.E.2d 891, 893–94 (1987); *Seabrook Island Prop. Owners Assoc. v. Marshland Trust, Inc.,* 358 S.C. 655, 662, 596 S.E.2d 380, 383 (Ct.App.2004). The rule of strict construction governing restrictive covenants, however, does not preclude their enforcement, for the rule should not be applied so as to defeat the plain and obvious purpose of the instrument. *Hamilton v. CCM, Inc.,* 274 S.C. 152, 158, 263 S.E.2d 378, 381 (1980); *Hoffman v. Cohen,* 262 S.C. 71, 76, 202 S.E.2d 363, 366 (1974); *Palmetto Dunes Resort, a Div. Of Greenwood Dev. Corp. v. Brown,* 287 S.C. 1, 6, 336 S.E.2d 15, 18–19 (Ct.App.1985). Greenwood Development cannot point to any specific provision

of the 1981 Covenants that Queen's Grant has violated. By its terms, the covenant authorizes Greenwood Development to bring legal action to enforce the terms of the agreement, and to be awarded legal fees for "maintaining compliance" with the covenants. We decline Greenwood Development's invitation that we sanction an award of attorney fees and costs under the isolated phrase "maintaining compliance." This phrase must be examined in the context of the entire provision and the rule of construction that any ambiguity must be strictly construed against the party seeking enforcement. The provision allows for the recovery of attorney fees *only* against "violators" of the covenants. Because Queen's Grant may not be fairly characterized as a "violator" of the covenants, we affirm the circuit court's denial of Greenwood Development's motion for attorney fees. *Accord Schneider v. Drake,* 44 P.3d 256, 262 (Colo.Ct.App.2001) (finding a declaratory judgment action alone insufficient to constitute a violation of the applicable covenants).[21]

## CONCLUSION

The increased assessments under the 1981 Covenants are valid and enforceable as to applicable units in the Queen's Grant II Horizontal Property Regime, and the order of the circuit court granting Greenwood Development summary judgment as to Queen's Grant claim for declaratory relief is affirmed in result in part. The grant of summary judgment is reversed in part, and the matter is remanded, as relates to the

---

21. We do not reach the underlying question of whether the attorney fee provision is enforceable at all. There is no attorney fee provision in the 1972 Declaration of Covenants. The provision was added in 1981 presumably pursuant to Greenwood Development's rights as Declarant to impose additional covenants running with the land "within the multi-family residential areas in Palmetto Dunes." Because Queen's Grant is not a "violator" and Greenwood Development is thus not entitled to an award of attorney fees, we need not decide whether a declarant may unilaterally impose a one-sided attorney fee provision under the guise of a covenant running with the land. *Cf. Harbison Cmty. Assoc., Inc. v. Mueller,* 319 S.C. 99, 102, 459 S.E.2d 860, 862 (Ct.App.1995) (covenants that touch and concern the land have a beneficial effect on the property and are said to "run with the land"); 20 Am.Jur.2d *Covenants, Conditions, and Restrictions* § 1 (2005) (defining a restrictive covenant as "an agreement ... to do, or refrain from doing, certain things with respect to real property").

five units that are subject only to Waiver Agreements that do not expressly reference the 1981 Covenants. We dismiss as interlocutory Greenwood Development's appeal from the denial of summary judgment as to its breach of contract action concerning the road repair invoice and remand the matter to the circuit court. We affirm the denial of Greenwood Development's motion for attorney fees and costs.

**AFFIRMED IN RESULT IN PART, REVERSED IN PART, DISMISSED IN PART, AND REMANDED.**

STILWELL and WILLIAMS, JJ., concur.