732 S.E.2d 652

**The STATE, Respondent,**

**v.**

**Demetrius PRICE, Appellant.**

**Appellate Case No.2009–147286.**

**No. 5031.**

Court of Appeals of South Carolina.

Heard June 19, 2012.

Decided Sept. 5, 2012.

Rehearing Denied Oct. 18, 2012.

Appellate Defender Kathrine H. Hudgins, for Appellant.

Attorney General Alan Wilson, Chief Deputy Attorney General John W. McIntosh, Senior Assistant Deputy Attorney General Salley W. Elliott, and Assistant Attorney General Mark R. Farthing, all of Columbia, and Solicitor Isaac McDuffie Stone, III, of Beaufort, for Respondent.

FEW, C.J.

Demetrius Price appeals his conviction for assault and battery with intent to kill (ABWIK). He argues the trial court erred in instructing the jury it could infer malice from the use of a deadly weapon. We affirm.

## I. Facts and Procedural History

Deon Cannick was shot in the neck at close range. The bullet exited through his back, leaving his spinal cord exposed. He was instantly paralyzed, but survived. There was no evidence the shooting was unintentional.

On the day of the shooting, Price and Lucius Simuel went to the apartment Deon shared with his brother, Deverol. The men asked Deon if he wanted to buy some drugs. When Deon declined, they asked him to go get Deverol so they could see if he wanted to make a purchase. Deon went upstairs and told Deverol the men wanted to see him. Deverol walked downstairs and outside to speak with Price and Simuel. Price offered to sell him pills and cocaine. When Deverol said "no," the men forced him back into the apartment and pulled out guns. They asked him, "where is the iron at?", which Deverol understood to mean, "where are the guns?" [1]

Meanwhile, Deon was upstairs playing a video game. His dog got out of the room, and he chased after her. When he

---

1. Urban Dictionary defines "iron" as "[a] gat, peice, heat, or any kind of handgun." *See Iron,* Urban Dictionary (Apr. 13, 2004), http://www. urbandictionary.com/define.php?term=iron. Time Magazine rated Ur-

caught the dog on the stairs, he looked up and saw Price pointing a gun at him from below. He also saw that Simuel had a gun aimed at Deverol's chest. Deon put his hands up and said, "please don't shoot me. You can have anything you want." Price and Simuel instructed Deon to come to them. With his hands still up, Deon began walking towards them. Price ran up the stairs, moved his gun to the left side of Deon's neck, and shot him. Deon tumbled down the stairs. As Deon lay bleeding at the foot of the staircase, Price and Simuel again asked, "where's the iron at?" and then ran away. Deverol went outside to look for Price and Simuel's car, and he was shot in his hand and abdomen.

Price was indicted and tried for ABWIK, first degree burglary, possession of a firearm during the commission of a violent crime, and unlawful possession of a firearm under section 16–23–30(B) of the South Carolina Code (Supp.2011). In its jury charge, the trial court instructed the jury that malice was an element of ABWIK and that "malice may be inferred from the conduct of a person if that conduct shows a total disregard for human life. Inferred malice may arise when the deed is done with a deadly weapon." The court also charged ABHAN as a lesser-included offense. During deliberations, the jury asked the court for a "summary of the conditions for ABWIK." The trial court recharged the jury on ABWIK and ABHAN, including the instruction that malice may be inferred from the use of a deadly weapon. The jury found Price guilty of all charges, and the court sentenced him to life without the possibility of parole on both the ABWIK and burglary convictions.[2] Price appeals only the conviction for ABWIK.

ban Dictionary as one of its "50 Best Websites" in 2008, the year Price shot Deon, and described it as follows: "To stay hip, visit Urban Dictionary, which has millions of user-submitted words and definitions. Visitors can vote on the best entries. . . ." Anita Hamilton, *Urban Dictionary—50 Best Websites 2008*, Time (Jun. 17, 2008), http://www.time.com/time/specials/2007/article/0,28804,1809858_1809955_1811527,00.html. On the date of publication of this opinion, the cited definition had 164 "up" votes and 48 "down" votes. "Peice," according to Urban Dictionary, is not a misspelling. However, that entry has more down votes than up.

2. The trial court sentenced Price to life for ABWIK pursuant to section 17–25–45 of the South Carolina Code (Supp.2011) because Price had

## II. Charge on Inferring Malice from Use of a Deadly Weapon

Price argues the trial court erred in instructing the jury that malice could be inferred from the use of a deadly weapon. *See State v. Belcher,* 385 S.C. 597, 685 S.E.2d 802 (2009).

### A. Issue Preservation

The State claims this issue is not preserved because Price did not object to the instruction in the charge conference or when the court initially charged the jury, but only after the court recharged the jury. The State argues Price was required to object before the jury began deliberating, and by failing to do so, he waived any objection to the charge. *See* Rule 20(b), SCRCrimP ("[T]he parties shall be given the opportunity to object to the giving or failure to give an instruction before the jury retires, but out of the hearing of the jury.... Failure to object in accordance with this rule shall constitute a waiver of objection.").[3] Price argues, however, that the jury's question on the "conditions of ABWIK" demonstrates its deliberations were controlled by the recharge, not the initial charge. By objecting to the instruction that actually affected the jury's decision, Price argues, he preserved the issue. We recognize there is a substantial question as to whether Price preserved this issue for appeal. However, we choose to address the merits of the issue. *Cf. Atl. Coast Builders & Contractors, LLC v. Lewis,* 398 S.C.

---

prior convictions from Georgia for armed robbery and burglary in the first degree.

3. The State makes the interesting argument that it is not possible for a trial court to correct an erroneously given charge that malice may be inferred from the use of a deadly weapon. The State points out that even under *Belcher,* malice may be inferred from the use of a deadly weapon. *See Belcher,* 385 S.C. at 612 n. 9, 685 S.E.2d at 810 n. 9 ("[W]e [do not] restrict the State from arguing to the jury for a finding of malice from the use of a deadly weapon.... 'Do jurors need the court's permission to infer something? The answer is, of course not.'" (citation omitted)). *Belcher* simply prohibits the trial court from telling that to the jury under the circumstances described in the opinion. Because the inference is permitted, the trial court has no way of correcting itself when it improperly gives the charge, as a corrective statement about the charge may give the jury the incorrect impression it is not allowed to draw the inference.

323, 330, 730 S.E.2d 282, 285 (2012) (stating "we . . . resolve the issue on preservation grounds when it clearly is unpreserved").

## B. The Inferred Malice Charge

Whether a trial court will be reversed for instructing the jury that malice may be inferred from the use of a deadly weapon depends on whether the jury was presented with evidence that, if the jury believed it, would reduce, mitigate, excuse, or justify the offense. *Belcher*, 385 S.C. at 610, 685 S.E.2d at 809 (holding "the 'use of a deadly weapon' implied malice instruction has no place in a[n] . . . assault and battery with intent to kill[ ] prosecution where evidence is presented that would reduce, mitigate, excuse or justify the . . . assault and battery with intent to kill"). We agree with the trial court that there was no evidence of self-defense or anything else which could excuse or justify ABWIK. We disagree, however, with the court's conclusion that there was evidence of an absence of malice, which would reduce or mitigate the offense. In deciding to give the ABHAN charge, the court stated:

> [S]ome of the testimony has indicated, indirectly though it might be, that this was something perhaps other than just a knocking down the door and going in there and shooting up everybody. And so there may be something there that is sufficient to indicate the absence of malice in this particular case.

We find no such evidence in the record. Our review of the record reveals no evidence that could reduce, mitigate, excuse, or justify this crime.

On appeal, Price points to testimony indicating that Deon and Deverol were drug-dealing gang members and that Deon's shooting may have been part of a drug deal gone wrong. We disagree that these facts would reduce, mitigate, excuse, or justify the crime. It is undisputed that someone shot Deon in the neck, causing him serious injury. The shooter raised the gun, pointed it at Deon, approached him, and shot him at close range as he stood with his hands up. There was no evidence to the contrary. There may have been conflicting evidence as to who did these things, but it is not possible to interpret the evidence to support any conclusion

other than that the person who shot Deon committed ABWIK. Therefore, if the jury believed Price is the person who shot Deon, Price is necessarily guilty of ABWIK. *See State v. Coleman*, 342 S.C. 172, 177, 536 S.E.2d 387, 389–90 (Ct.App. 2000) (affirming trial court's decision to not charge ABHAN as lesser-included offense of ABWIK, where "Coleman's manner in using the weapon—pointing the gun at Victim and then deliberately raising the gun to aim at Victim's head just before he fired—could have only been reasonably calculated to kill or cause great bodily harm to Victim. Moreover, the resulting wound was near-fatal." (footnote omitted)).

*Belcher* does not prohibit the trial court from instructing the jury that it may infer malice from the use of a deadly weapon where the only jury question created by the evidence is whether the defendant is the person who committed ABWIK. *See Belcher*, 385 S.C. at 612, 685 S.E.2d at 810 (stating "the permissive inference charge concerning the use of a deadly weapon remains a correct statement of the law where the only issue presented to the jury is whether the defendant has committed . . . assault and battery with intent to kill"). On the facts of this case, we find no error.

Price's ABWIK conviction is **AFFIRMED.**

SHORT, J., concurs in result only.

HUFF, J., dissents.

HUFF, J., dissenting.

Because I believe the issue raised on appeal is properly preserved and the trial court committed reversible error in charging the jury that malice could be inferred from the use of a deadly weapon under the facts of this case, I respectfully dissent. I disagree with the majority's conclusion that the only jury question created by the evidence is whether the defendant is the person who committed assault and battery with intent to kill (ABWIK). Rather, I would find there is evidence that would reduce or mitigate the alleged ABWIK, such that the charge on inferred malice from the use of a deadly weapon was reversible error.

Demetrius Price was convicted of first degree burglary, ABWIK, possession of a weapon during the commission of a

violent crime, and possession of a handgun by a prohibited person. The trial court sentenced Price to life without the possibility of parole on both the burglary and ABWIK charges, and five years each on the weapon charges. Price appeals only his conviction and sentence for ABWIK, asserting the trial court committed reversible error in charging the jury that malice could be inferred when the deed was done with a deadly weapon, because evidence was presented that would reduce the ABWIK charge to assault and battery of a high and aggravated nature (ABHAN). I would reverse Price's ABWIK conviction, and remand for a new trial on this charge.[4]

## FACTUAL/PROCEDURAL BACKGROUND

Price was tried for and convicted of the above charges along with his co-defendant, Lucius Simuel. The charges stem from an incident which resulted in severe injuries to two brothers, the younger being left paralyzed. The State's theory was that Price and Simuel intended to rob the drug-dealing brothers, but shot them instead. The record reveals the following:

During the day on July 28, 2008, eighteen year old Deon Cannick and his older brother, Deverol Cannick,[5] were shot at the apartment the brothers shared with their two brothers, Malik Campbell and Marcus Campbell, and with Deverol's girlfriend, Sharita Willingham. According to Deon, he was in his upstairs apartment when he received a phone call from his friend, Martin Guzman. He went downstairs to talk to Martin and Jesse Reese, who wanted a $5 bag of marijuana. After Deon returned with the marijuana, Martin and Jesse informed Deon that two men were looking for him. Deon noticed two men walking up to him, recognizing one of the men as Lucius Simuel, who was the uncle of his ex-girlfriend, Tiah Frazier. The men asked Deon if he wanted some drugs, and when he replied he did not, they asked him to go get his brother, Deverol. Deon went upstairs and told Deverol that Tiah's uncle was down there looking for him, and Deverol then went

---

4. It should be noted that our legislature has abolished the common-law offense of ABWIK for offenses occurring on or after June 2, 2010. S.C.Code Ann. § 16–3–620 (Supp.2011).

5. Deverol also uses the name Devin Cannick, and goes by the nickname "Reese" as well.

downstairs. Deon remained upstairs playing video games until Sharita opened a door, letting one of their pit bulls out of a room. When the dog started running downstairs, Deon ran after her and grabbed her harness. As Deon looked up, he saw two men with guns, one of the men pointing his gun at Deon. Deon did not know the person pointing the gun at him, but recognized him as the same man who had accompanied Simuel that day. The men instructed Deon to come to them. Deon put his hands in the air and started walking toward them, and the man then waived the gun to the left of Deon's neck and shot Deon. Deon rolled to the bottom of the stairs, where he saw Simuel and Price, along with his brother. Deverol exclaimed, "you shot my brother," at which point Simuel and Price asked, "where's the iron at?" Deon understood this to mean they were asking about guns. Deon thought the men wanted to go upstairs, but they turned and ran outside instead because the dog was still on the steps. Deverol ran outside, after which Deon heard the sounds of gunshots, and Deverol then ran back inside bleeding. Deon stated he never gave any money or marijuana to the people who came in his home, and to his knowledge, they did not take anything.

On cross-examination, Deon admitted that he was a marijuana dealer at the time of the incident, he and Deverol were both members of a gang, and that Deverol was also a drug dealer who sold drugs besides marijuana, including cocaine, hydrocone and ecstasy pills. Deon further acknowledged that he had a conversation with Simuel previously concerning the purchase of ecstasy pills involving his brother, that Deverol had asked about buying the pills from Simuel, and Deon had asked Simuel for the pills on behalf of Deverol. When Simuel came to his door that day, Simuel asked Deon if he wanted to buy marijuana, ecstasy pills, and cocaine. Deon reiterated that the men had said "where the iron at," and denied they asked, "any more iron, any more iron up there?" He initially acknowledged that he told one of the detectives the men said, "any more iron, any more iron up there," but testified they actually asked "where's the iron at?" He later testified the detective might have made a mistake in writing up the interview.

Deverol testified that on the day of the incident, there was a knock at the door and his brother then told him that Tiah's uncle was at the door. Deverol went downstairs and opened the door and shut it behind him. He saw Tiah's uncle, Simuel, and another man. Simuel pointed to Price and told Deverol that this was the guy Simuel had told him about, but Deverol did not know what Simuel was talking about. Price asked Deverol if he wanted to buy any pills, and Deverol said he did not. The man then pulled out a bag of what appeared to be cocaine and asked Deverol if he wanted some of that, which Deverol again declined. Deverol saw two bags being pulled out, and he was then pushed back toward the door inside his apartment. Both men had guns, but Deverol denied that he had a gun on him at that time. Once they had pushed Deverol back into the house, the men said "'where is the iron at,' meaning, where are the guns." Deon had run downstairs once he heard the commotion, and grabbed the dog by her collar as she ran past him. Before Deverol knew it, Price reached up and shot Deon. Deon fell down the stairs, and Deverol ran around inside the home a little while, going up the stairs, before going outside to try to look for the men's car. Once outside, he saw the men arguing, at which point he dropped to the ground. Both men had a gun. Deverol was shot in the hand and, after that, the men shot him in his side. Deverol admitted he was selling drugs while living at the apartment, including cocaine, marijuana and pills, and these drugs were in his apartment at the time of the incident. He also admitted to owning guns, but denied having them on his person at the time he went to answer the door.

Sharita Willingham testified she was in the apartment living room on the day in question when there was a knock at the door, and Deverol and Deon went downstairs to see who was there. She let her dog out of a room, and the dog ended up running downstairs. Sharita stated she looked over the bannister to where Deon and Deverol stood, observed Simuel holding a long gun and trying to force open the door, and saw Deverol attempting to close the door. Simuel pushed the door open and entered the apartment. When Sharita ran to find her phone, she heard a gunshot, and then heard two more shots. Sharita testified there were two people at the door other than Deverol. Sharita agreed that in her statement to

law enforcement she indicated that "the guy outpowered Deverol and they began to argue."

Investigation of the matter lead authorities to Price and Simuel. Simuel eventually turned himself in to the authorities and gave statements to them. The State introduced Simuel's redacted statements into evidence. In the first statement, Simuel told authorities he went to Deon and Deverol's house and he was not expecting anyone to get shot. He stated he was "being greedy and wanted money," and that he had set the whole thing up and would have to deal with the consequences. Simuel stated he had been to Deon's home before, smoking a joint and having a conversation with Deon's brother. Deon's brother asked Simuel about getting some pills. On the morning of the shooting, Simuel received a call from his nephew advising Simuel that "he was looking for some pills." Simuel went to Deon's house, where he saw "a white kid and a Mexican standing outside of Deon's house and thought this was strange as no one ever is just hanging out in front of their house." Simuel saw Deon outside with them, and Deon was acting strangely. Deon went inside to get his brother. Deon's brother then came out, and a few minutes later **Deon came out with a gun, "stating where is it at."** Simuel said "the Mexican" then pulled a gun. Simuel heard a shot and saw Deon go down. Simuel started running and heard another three gunshots. Simuel stated he was afraid because of the large amount of pills in the car. Thereafter, Simuel called his niece, Tiah, and told her that her boyfriend tried to set him up. Simuel denied shooting anyone. On another occasion, Simuel told authorities that he was involved in the incident, but denied having a gun or shooting anyone. He stated he told the authorities eighty percent of the truth in the first interview, and after leading them that far, they would have to do the rest of the work. Finally, Simuel met with authorities one more time and gave another statement. He denied breaking into anyone's residence or having a weapon while at Deon's, but indicated he originally lied about the incident. When asked how he became involved, Simuel stated he received a call from his niece, Tiah Frazier, and his nephew, Chris Battle, concerning pills for Tiah's boyfriend, Deon.

The investigator who interviewed Deon acknowledged that Deon, in describing the incident, stated he heard the two men

ask, "any more iron, any more iron up there." Deon also told the investigator that he talked about getting some pills so he could make some extra money weeks before the shooting, and when referring to the incident, Deon stated he "was overcome with a crazy feeling" as the two men approached. The investigator agreed he found no evidence of forced entry to the door, such as a dent or the door being broken. The same investigator interviewed Malik on the day of the shooting, at which time Malik stated that he went to the top of the stairs during the incident to see what was wrong, and observed two subjects at the bottom of the stairs fighting with his brothers. Malik also testified, admitting he talked to the investigator, but denied telling him he saw his brothers fighting with the suspects, explaining he must have been misunderstood on that point. A search of the victims' apartment led to the discovery of four guns in the bedrooms. Also found throughout the apartment were various suspected drugs, including cocaine and marijuana, as well as marijuana plants and two bundles of hydrocodone tablets.

Tiah Frazier testified that on July 28, 2008, Deon called her and asked to talk to her uncle, but Simuel was not there, so Tiah gave Deon a contact number for Simuel. Deon indicated to Tiah in the call that he wanted to buy some pills. Later in the day, on the afternoon of the shooting, Simuel called Tiah and told her that Deon had tried to rob him and that Deon had been shot. Chris Battle, Tiah's brother and Simuel's nephew, also testified to events he recalled from July 28. Chris stated that Deon called Tiah that day and asked if Simuel was home and asked for a number, which Tiah gave Deon. Deon asked for the number because he wanted some pills. They called Simuel and told him Deon was asking for some pills. Hours went by before they heard from their uncle, and when he finally called, he told them that "the deal went bad" and Deon and his brother were shot.

After both the State and Defenses rested, the trial court noted it was inclined to charge ABHAN to the jury, noting there was "some evidence in the record from which some of the testimony has indicated, indirectly though it may be, that this was something perhaps other than just a knocking down the door and going in there and shooting up everybody," such that there may be evidence "sufficient to indicate the absence

of malice in this particular case." Counsel for both Price and Simuel requested the court give an ABHAN charge, and the solicitor stated he had no objection, because the jury could find there was an absence of malice from the evidence. The two defense attorneys also requested a self-defense charge, arguing there was evidence from Simuel's statement that Deon pulled a gun out and asked "where is it at," and there was evidence concerning the deal having "gone bad," and the victims were trying to rob the defendants. The trial court declined, however, to charge self-defense.

The court thereafter charged ABWIK and ABHAN to the jury. During the court's charge on ABWIK, it instructed the jury that malice could be inferred from the use of a deadly weapon. Neither counsel for the defendants objected to the court's inference charge at that time. After deliberations began, however, the jury requested a written summary "of the conditions of ABWIK." In response, the trial court instructed the jury on virtually the same law it had previously charged on both ABWIK and ABHAN, including a charge on malice and that malice could be inferred from the use of a deadly weapon. In particular, the trial court recharged the jury as follows:

> Malice can be inferred from conduct which shows a total disregard for human life. Inferred malice can arise when the deed is done with a deadly weapon. A deadly weapon obviously is any article or instrument which is likely to cause death or bodily harm.

> And so if facts are proven beyond a reasonable doubt sufficient to raise an inference of malice to your satisfaction, that's an inference that is simply an evidentiary fact. And you can consider that, along with all of the other evidence in the case, and give it the weight that you think it should receive.

This time, trial counsel for Price excepted to the court's charge based upon the court's inclusion of language that was excluded by *State v. Belcher*, 385 S.C. 597, 685 S.E.2d 802 (2009). The trial court noted its instruction did include the language excluded by *Belcher*. It concluded, however, that *Belcher* was inapplicable, because *Belcher* was limited to situations involving self-defense and "things of that nature," and

the court had found self-defense did not lie in this case. Price was thereafter convicted as charged.

**ISSUE**

Whether the trial court committed reversible error, based on *Belcher*, by instructing the jury during its charge on the law of ABWIK that "inferred malice may arise when the deed is done with a deadly weapon," where evidence was presented that would reduce the ABWIK to ABHAN, and the court instructed the jury on ABHAN.

**LAW/ANALYSIS**

Price contends the trial court committed reversible error by instructing the jury that malice could be inferred from the use of a deadly weapon, as there was evidence presented that would reduce the ABWIK charge to ABHAN, and the inferred malice charge was thus erroneous pursuant to *Belcher*. Price further argues the trial court erred in finding *Belcher* is limited to cases in which a defendant is entitled to a self-defense instruction. I agree.

First, I disagree with the State's contention that the issue is not properly preserved, or that Price somehow waived it because he failed to object to the inferred malice instruction when initially charged by the trial court. "In order for an issue to be preserved for appellate review, it must have been raised to and ruled upon by the trial judge." *State v. Dunbar*, 356 S.C. 138, 142, 587 S.E.2d 691, 693 (2003). As recently noted by our supreme court, "[i]ssue preservation rules are designed to give the trial court a fair opportunity to rule on the issues, and thus provide us with a platform for meaningful appellate review." *Atl. Coast Builders & Contractors, LLC v. Lewis*, 398 S.C. 323, 329, 730 S.E.2d 282, 285 (2012) (quoting *Queen's Grant II Horizontal Prop. Regime v. Greenwood Dev. Corp.*, 368 S.C. 342, 373, 628 S.E.2d 902, 919 (Ct.App.2006)). Here, Price specifically excepted to the inferred malice charge immediately after the trial judge recharged the jury the allegedly offending language. The trial judge proceeded to address Price's concerns pursuant to *Belcher*, ultimately finding *Belcher* inapplicable. Thus, the matter was clearly raised to the trial judge, and the trial judge clearly ruled upon the matter. Additionally, I find Price did not waive any objection to the charge by failing to object when the matter was initially

charged by the court. This matter involves two separate charges. While Price may very well have waived his objection to the *initial* inferred malice charge by failing to contemporaneously object, he specifically objected to the recharge and did not waive his subsequent objection to this allegedly erroneous instruction. Hence, a contemporaneous objection was made to the second charge that malice could be inferred from the use of a deadly weapon, and this issue is therefore preserved as to the second charge. Neither do I find Price's failure to object after the initial charge and prior to the jury initially retiring for deliberations constitutes waiver of his right to subsequently challenge the recharge pursuant to Rule 20(b), SCRCrimP. This rule provides in part as follows: "Notwithstanding any request for legal instructions, the parties shall be given the opportunity to object to the giving or failure to give an instruction before the jury retires.... Failure to object in accordance with this rule shall constitute a waiver of objection." Rule 20(b), SCRCrimP. Our supreme court has specifically declined to give a strident interpretation to Rule 20(b), instead finding an objection to a jury charge preserved under the rule where an on-the-record ruling· was made after an opportunity for discussion, in spite of the fact that the objection to the charge was not renewed after the conclusion of the charge. *See State v. Johnson*, 333 S.C. 62, 64 n. 1, 508 S.E.2d 29, 30 n. 1 (1998) (holding, where appellant's request to charge was denied on-the-record after an opportunity for discussion, Rule 20(b), SCRCrimP did not require appellant to renew his request at the conclusion of the charge in order to preserve the issue on appeal). Further, I disagree with the State's assertion that Price could have suffered no prejudice from the alleged error because the charge had previously been presented to the jury without objection. Once Price objected to the recharge, it was incumbent upon the trial judge to correct any error in his charge. Thus, assuming the charge was erroneous pursuant to *Belcher* and required correction, it cannot be said Price suffered no prejudice when the trial judge failed to give a corrected charge.[6]

---

6. I disagree with the State's contention that it is not possible for a trial court to correct an erroneously given charge that malice may be inferred from the use of a deadly weapon because a corrective statement about the charge may give the jury the incorrect impression it is

On the merits, I believe the trial court erred in charging the jury that malice could be inferred from the use of a deadly weapon under the facts of this case. The trial court is required to charge *only* the current and correct law of South Carolina, and the law to be charged must be determined from the evidence presented at trial. *State v. Brandt*, 393 S.C. 526, 549, 713 S.E.2d 591, 603 (2011). "An instruction should not be given unless justified by the evidence." *State v. Cooney*, 320 S.C. 107, 110, 463 S.E.2d 597, 599 (1995).

In *Belcher*, decided one month prior to the trial in the case at hand, our supreme court addressed and overruled a long line of cases pertaining to jury instructions regarding the permissive inference of malice from the use of a deadly weapon. There, the court noted, while it had long been the sanctioned practice for trial courts in South Carolina to charge juries in any murder prosecution that the jury may infer malice from the use of a deadly weapon, after "carefully scrutinize[ing] the historical antecedents to this permissive inference," from there forward, a jury charge instructing that malice may be inferred from the use of a deadly weapon is no longer good law in South Carolina where evidence is presented that would reduce, mitigate, excuse or justify the homicide. 385 S.C. at 600, 685 S.E.2d at 803–04. Unable to harmonize more recent jurisprudence (which sanctioned an inference of malice based upon the use of a deadly weapon charge regard- less of whether evidence was presented that would reduce, mitigate, excuse or justify a killing) with earlier writings of the court that placed a qualification on such a charge, our supreme court found that malice includes the absence of justification,

---

not allowed to draw the inference. This would be true even in situa- tions where an initial objection is made to the charge, and *Belcher* makes clear that such an erroneous charge will not be tolerated. The court could have instructed the jury to disregard its previous charge concerning inferred malice and the use of a deadly weapon and then properly charged the jury, or perhaps fashioned some other instruction to correct the matter. Because the trial court overruled the objection to the charge, no corrective charge possibilities were ever broached. At any rate, regardless of whether the objection was raised at the initial charge or the subsequent charge, I do not believe that an erroneous jury charge under *Belcher* is excusable simply because the trial court would have had difficulty correcting the charge, or that such difficulty would result in a determination that a defendant in such a situation would not have been prejudiced.

excuse and mitigation such that, when viewing malice in light of these component parts, "inferring malice from the use of a deadly weapon is indeed only a 'half-truth.' " *Id.* at 609–10, 685 S.E.2d at 808. Thus, "[t]he absence of justification, excuse or mitigation cannot be inferred from the use of a deadly weapon standing alone," and "[o]ther facts and evidence (or the absence of other facts and evidence) are required for the fulfillment of these component parts." *Id.* at 610, 685 S.E.2d at 808–09. Based upon this analysis, the court in Belcher stated:

> Under our policy-making role in the common law, we hold that the "use of a deadly weapon" implied malice instruction has no place in a murder (or assault and battery with intent to kill) prosecution where evidence is presented that would reduce, mitigate, excuse or justify the killing (or the alleged assault and battery with intent to kill).

*Id.* at 610, 685 S.E.2d at 809. The court further particularly noted in a footnote to this holding that, because the crime of assault and battery with intent to kill requires malice, its holding in this regard also applied to ABWIK. *Id.* at 610 n. 6, 685 S.E.2d at 809 n. 6.

Additionally, the court in *Belcher* recognized the trial court had charged the jury that the killing had to be unlawful and that there "ha[d] to be a deliberate and intentional design to use or employ or handle a deadly weapon so as to endanger the life of another without just cause or excuse." Nevertheless, it determined that "instructing a jury that 'malice may be inferred by the use of a deadly weapon' is confusing and prejudicial where evidence is presented that would reduce, mitigate, excuse or justify the homicide," noting that "[a] jury charge is no place for purposeful ambiguity." *Id.* at 611, 685 S.E.2d at 809.

Finally, the *Belcher* court agreed that erroneous jury instructions are subject to a harmless error analysis, and acknowledged that in many murder prosecutions there may be overwhelming evidence of malice apart from the use of a deadly weapon. However, the court held the error in charging that malice could be inferred by the use of a deadly weapon could not be considered harmless beyond a reasonable doubt in that case, as evidence of self-defense was presented,

thereby highlighting the prejudice resulting from the charge. *Id.* at 611–12, 685 S.E.2d at 809–10.

The *Belcher* court therefore concluded, "where evidence is presented that would reduce, mitigate, excuse or justify a homicide (or assault and battery with intent to kill) caused by the use of a deadly weapon, juries shall not be charged that malice may be inferred from the use of a deadly weapon." *Id.* at 612, 685 S.E.2d at 810.

Turning to the case at hand, I find the trial court committed reversible error in charging the jury that malice could be inferred from the use of a deadly weapon. First, contrary to the trial court's position, *Belcher* is not limited to situations involving self-defense such that the mandates of *Belcher* are not transgressed if self-defense does not lie. *Belcher* makes absolutely clear that where evidence is presented that would reduce, mitigate, excuse or justify the killing or the alleged assault and battery with intent to kill, a jury charge that malice may be inferred from the use of a deadly weapon is improper. Here, evidence was presented from which the jury could conclude Price and his co-defendant did not simply shoot Deon and Deverol while carrying out their plan to rob the two brothers. Specifically, evidence was presented that Deon had previously discussed with Simuel obtaining ecstasy pills from Simuel on Deverol's behalf, and Simuel had appeared at Deon and Deverol's home that day with Price after Deon had attempted to contact Simuel that day for the purpose of obtaining the pills. Significantly, evidence was presented that Deon pulled a gun out as Price and Simuel attempted to conduct a drug transaction with Deverol and stated "where is it at," thereby showing Price and Simuel may have, in fact, been the target of an armed robbery. Additionally, there is evidence Deon, in describing the incident to an investigator, stated he heard the two men ask if there was "*any more* iron up there," referring to guns, and indicating the victims may have, in fact, previously pulled a gun on the defendants while in the downstairs area. The investigator testified he found no evidence of forced entry to the apartment door, and Malik told the investigator that he observed two subjects at the bottom of the stairs fighting with his brothers during the incident. Also, Simuel's niece, Tiah, testified that on the day of the shooting, Deon had called her and asked to talk to her uncle, indicating

he wanted to talk to Simuel about buying some pills, and later that day Simuel called Tiah and told her that Deon had tried to rob him. Chris Battle, Simuel's nephew, corroborated that Deon called Tiah that day and asked for Simuel because he wanted some pills, Tiah and Chris called Simuel and told him Deon was asking for some pills, and hours later, Simuel called and told them that "the deal went bad."[7] Thus, evidence was presented that would reduce or mitigate the alleged ABWIK, making the charge on inferred malice from the use of a deadly weapon improper. I find very telling the fact that the trial court recognized the presence of such evidence, specifically noting the appropriateness of a charge on ABHAN based on evidence that the incident was something "other than just a knocking down the door and going in there and shooting up everybody" but, rather, was "sufficient to indicate the absence of malice in this particular case." As well, the State specifically conceded during the trial that the jury could find there was an absence of malice from the evidence.

The supreme court in *Belcher* made a thorough analysis in its well-reasoned opinion, clearly elucidating, based upon historical antecedents, that because malice includes the absence of justification, excuse and mitigation, an inference of malice based upon the use of a deadly weapon charge is no longer proper where evidence is presented that would reduce, mitigate, excuse or justify the killing or the alleged ABWIK. Because I believe there was evidence presented that would, at a minimum, reduce or mitigate the alleged ABWIK, thereby showing a possible absence of malice, I believe the trial court erred in charging that jury that malice could be inferred from the use of a deadly weapon.

---

7. I do not agree with the majority's position that the only conflicting evidence was as to who shot Deon, and the only possible interpretation of the evidence was that the person who shot Deon committed ABWIK. Though Deon did testify the shooter pointed a gun at him and, while Deon's hands were in the air, the man waived the gun to the left of Deon's neck and shot him, there was evidence presented from which the jury could conclude that the defendants were actually targeted for a robbery by the victims, and the defendants managed to gain the upper hand in the situation. In other words, given the conflicting evidence on why the shooting came about, the jury was free to believe or disbelieve Deon's version of the events.

Second, the fact that the trial court may have charged the jury that the unlawful act had to be an intentional one and had to be done without just cause or excuse did not cure the error in charging that malice could be inferred from the use of a deadly weapon in this instance. *See id.* at 611, 685 S.E.2d at 809 (holding, though the trial court had charged the jury that the killing had to be unlawful and that there had to be a deliberate and intentional design to use or employ or handle a deadly weapon so as to endanger the life of another without just cause or excuse, instructing the jury that malice could be inferred by the use of a deadly weapon was nonetheless confusing and prejudicial where evidence was presented that would reduce, mitigate, excuse or justify the homicide).

Lastly, I disagree with the State's contention that any error in charging the jury on inferred malice was harmless in light of overwhelming evidence of malice presented at trial. Here, as noted, evidence was presented that would reduce or mitigate the ABWIK charge. In fact, both the trial court and the State acknowledged at trial that there was evidence presented from which the jury could determine there was an absence of malice. I cannot conclude, beyond a reasonable doubt, that the trial court's error in charging that malice could be inferred from the use of a deadly weapon did not contribute to the jury's guilty verdict on the charge of ABWIK. Accordingly, I cannot find that the trial court's error in so charging the jury was harmless beyond a reasonable doubt. *See id.* at 611–12, 685 S.E.2d at 809–10 (noting, though the court agreed that erroneous jury instructions are subject to a harmless error analysis and acknowledged that in many murder prosecutions there may be overwhelming evidence of malice apart from the use of a deadly weapon, the error in charging that malice could be inferred by the use of a deadly weapon could not be considered harmless beyond a reasonable doubt in that case, as evidence of self-defense was presented, thereby highlighting the prejudice resulting from the charge); *see also State v. Tapp,* 398 S.C. 376, 728 S.E.2d 468 (2012) (holding error is considered harmless when it could not reasonably have affected the result of the trial, and noting our jurisprudence requires the appellate court, when engaging in a harmless error analysis, not to question whether the State proved its case beyond a reasonable doubt, but to question whether beyond a

reasonable doubt the trial error did not contribute to the guilty verdict).

## CONCLUSION

I would find the issue was raised and ruled upon below such that it is preserved for our review, and Price did not waive consideration of the issue when he objected to only the recharge. Further, pursuant to *Belcher*, I would hold the trial court erred in charging the jury that malice could be inferred from the use of a deadly weapon under the facts of this case, and such error was not harmless. Accordingly, I would reverse and remand Price's ABWIK conviction.