# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Chandelle Property Owners Association, Respondent,

v.

James Douglas Armstrong, Jane Armstrong, Kenneth L. Galloway, Molly C. Galloway, Warren Johnson, Rhonda Johnson, John K. Payne, Ruth G. Payne, and Jane Van Wieren as Trustee of the Greer R.G. Irrevocable Property Trust, dated October 26, 2006, and also all other persons unknown, claiming any right, title, estate, interest in or lien upon the real estate described in the complaint herein, Defendants,

and

James Douglas Armstrong, Jane Armstrong, Warren Johnson, Rhonda Johnson, John K. Payne, Ruth G. Payne, and Jane Van Wieren as Trustee of the Greer R.G. Irrevocable Property Trust dated October 25, 2006, Third-Party Plaintiffs,

v.

Billy J. Israel, Bruce R. Goldberg, Cindy R. Goldberg, and George Lynn Fleming in their personal and official capacities, Third-Party Defendants,

and

Kenneth L. Galloway and Molly C. Galloway, Third-Party Plaintiffs,

v.

Billy J. Israel, Bruce R. Goldberg, Cindy R. Goldberg, and George Lynn Fleming, in their personal and official

capacities, Third-Party Defendants,

Of whom James Douglas Armstrong, Jane Armstrong, Warren Johnson, Rhonda Johnson, John K. Payne, Ruth G. Payne, and Jane Van Wieren as Trustee of the Greer R.G. Irrevocable Property Trust dated October 25, 2006, are the Appellants.

Appellate Case No. 2022-001557

———————

Appeal From Spartanburg County
R. Keith Kelly, Circuit Court Judge

———————

Opinion No. 6078
Heard June 4, 2024 – Filed August 7, 2024

———————

**AFFIRMED**

———————

Wendell L. Hawkins, of Wendell L. Hawkins, PA, of Greer, for Appellants.

James P. Walsh and John D. Harjehausen, both of Clarkson, Walsh & Coulter, P.A., of Greenville; and Donald Ryan McCabe, Jr., of McCabe, Trotter & Beverly, P.C., of Columbia, all for Respondent.

———————

**MCDONALD, J.:** This case stems from several disputes within the Chandelle Subdivision (Chandelle), a residential aviation community in Spartanburg County. Appellants[1] contend the circuit court erred in granting Respondent Chandelle Property Owners Association's (the POA) motion for partial summary judgment; they assert association bylaws prohibited the POA from incurring debt in excess of

---

[1] Appellants are the owners of properties generally known as Lots 1, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 55, 56, and 57 within Chandelle (the Subject Lots).

$50,000 without a vote of the association and the declaration of covenants, conditions, and restrictions (the Restrictive Covenants) allow annual assessments to be used only for maintenance. Appellants challenge the circuit court's award of back assessments to the POA and claim the assessments are "ostensibly attorney's fees" in disguise. We affirm the circuit court's order granting partial summary judgment.

**Facts and Procedural History**

In February 1997, CSC Developers, LLC and James P. Brockman, Sr. agreed to develop approximately thirteen acres of Brockman's land as part of the Chandelle subdivision. On December 16, 1997, CSC Developers recorded the Restrictive Covenants (the Original Declaration) with the Register of Deeds for Spartanburg County. The Original Declaration was subsequently amended and supplemented (the Declaration).

The Original Declaration specified Lots 1 through 26 were subject to and bound by the Restrictive Covenants:

> NOW, THEREFORE, Declarant, by this DECLARATION of Covenants, Conditions and Restrictions does hereby declare that all the property described herein and shown as lots 1 through 26 on the Chandelle Subdivision plat dated September 24, 1997 by Huskey & Huskey, Inc. for Spartanburg County, South Carolina is and shall be held, transferred, sold, conveyed and occupied subject to the covenants, conditions, restrictions, easements, charges and liens set forth in the Declaration which shall run with the real property and be binding on all parties owning any right, title or interest in said real property or any part thereof, their heirs, successors and assigns, and shall inure for the benefit of each owner thereof.

The Brockman land included on the plat referenced in the Original Declaration (the Section 1 Plat) roughly encompassed Lots 1-10. Brockman was given a copy of the Section 1 Plat and was aware his land was included there. Though the Section 1 Plat was approved for recording, CSC Developers kept it on file with the Spartanburg County Planning Commission and sold the lots in Section 1 by referencing individual lot surveys in order to save on taxes. Nevertheless, CSC

Developers intended that all of the property on the Section 1 Plat be part of the Chandelle Subdivision and that this property—including Lots 1-10—would be bound by the Declaration.[2]

The Declaration envisioned and authorized additional properties being subject to the Declaration as lots were added to Chandelle. After the Original Declaration was recorded, CSC Developers continued to expand Chandelle and recorded the following plats for the newer sections of the community:

- Chandelle Section 1-A, recorded on September 1, 1998 in Plat Book 142, Pg. 376
  - Depicting roads and Lots 13 and 22.
- Chandelle Section 2A, recorded November 8, 2000 in Plat Book 149, Pg. 64
  - Depicting Lots 50, 51, 52, 53, and 54
- Chandelle Section 3-A, recorded September 26, 2002 in Plat Book 153, Pg. 97
  - Depicting Lot 39
- Chandelle Section 3, recorded November 5, 2004 in Plat Book 156, Pg. 982
  - Depicting Lots 39A, 40, 41, 42, 43, 44, 45, 46, and 47, and additional land.

On December 28, 2004, CSC Developers signed and recorded an instrument annexing the following lots into Chandelle and subjecting them to the Declaration: Chandelle Section 1A; Lot 39 (Section 3A) and Lots 39a and 40-47 (Section 3).

CSC Developers then recorded these plats for additional sections of Chandelle:

- Chandelle Section 4, recorded November 1, 2005 in Plat Book 158, Pg. 840
  - Depicting Lots 33 and 37
- Chandelle Section 7, recorded December 6, 2005 in Plat Book 159, Pg. 9
  - Depicting Lots 27 and 28

---

[2] As of the date of the circuit court's order, CSC Developers had sold Lots 1, 5, 7, 8, 9, and 10. All of the deeds from Brockman to the initial purchasers of these lots specifically reference the property as being subject to the Declaration.

- Chandelle Section 6, recorded December 14, 2006 in
  Plat Book 160, Pg. 852
    o Depicting Lots 29, 30, and 34

CSC Developers signed and recorded an April 17, 2007 instrument annexing the
following lots and subjecting them to the Declaration: Lots 33 and 37 (Section 4);
Lots 29, 30, and 34 (Section 6); and Lots 27 and 28 (Section 7).

They later recorded these plats:

- Chandelle Section 4A, recorded January 8, 2009 in Plat
  Book 163, Pg. 885
    o Depicting Lots 32 and 36
- Chandelle Section 5, recorded November 20, 2009 in Plat
  Book 164, Pg. 709
    o Depicting Lots 31 and 35
- Chandelle Section 8, recorded October 21, 2011 in Plat
  Book 166, Pg. 249
    o Depicting Lots 55, 56, and 57

CSC Developers recorded another instrument on November 2, 2011, annexing the
following lots and subjecting them to the Declaration: Lots 32 and 36 (Section
4A); Lots 31 and 35 (Section 5); and Lots 55, 56, and 57 (Section 8).  However,
this recording differed in that POA board members Billy J. Israel, Jr. and Bruce
Goldberg signed the instrument.[3]  CSC Developers recorded a revised plat for

---

[3] The circuit court's partial summary judgment order states:

> [E]vidence was submitted to the Court that: (1) everyone
> involved, including CSC Developers, LLC, thought that
> this was the proper way to do it now that homeowners
> had been appointed to the Board of Directors for
> Plaintiff; (2) CSC Developers, LLC was in agreement
> with the Board members signing the instrument and CSC
> Developers, LLC knew it was being done; [(3)] CSC
> Developers, LLC intended these lots be bound by the
> Declaration and intended that this instrument bind them;
> and (4) the Board members thought they were simply

Chandelle Section 8 on December 13, 2016 in Plat Book 171, Pg. 927. This plat depicts Lots 55, 56, and revised Lot 57.

After various questions and disputes arose surrounding the development, the POA brought this quiet title action, in part to remove any uncertainty as to which properties were subject to and bound by the Declaration.[4] The POA then filed an amended complaint adding a cause of action addressing negative reciprocal easements. It later filed a second amended complaint seeking a declaratory judgment that Appellants and others were subject to the Declaration on the equitable theory of negative reciprocal easements; this amended complaint again included the quiet title claim.[5] Appellants answered and asserted counterclaims and third-party claims against Billy J. Israel, Jr., Bruce R. Goldberg, Cindy R. Goldberg and George Lynn Fleming (the Third-Party Defendants).

On April 23, 2018, CSC Developers and Chandelle Runway, LLC, filed for bankruptcy, and the circuit court stayed the consolidated actions. The United States Bankruptcy Court lifted the automatic stay on May 21, 2020.

On November 3, 2020, the POA filed its third amended summons and complaint, seeking determinations that Appellants and their properties (including the Subject Lots) are subject to the Declaration and that Appellants are mandatory members of the POA. This amended filing included claims for declaratory judgment, to quiet title, and for reciprocal negative easements. In this filing, the POA also brought

---

certifying the instrument as being proper pursuant to CSC Developers, LLC's authority.

[4] A related dispute involving the central airfield and runway around which Chandelle was developed bears mention. The Developers promised the original owners the runway would be an amenity owned by the owners' association, but the Developers reneged on this promise and conveyed the runway to a different entity. Disagreements later arose among the Chandelle property owners regarding how best to respond; some owners opposed taking action against the Developers and eventually announced they were not part of the Association and were not bound by the Declaration. Some stopped paying their assessments or took the position that they would pay only those assessments with which they specifically agreed. After some years of litigation, these owners conceded they were part of the Association.

[5] The circuit court designated this litigation complex and consolidated it with other related cases.

claims against Appellants to collect back assessments and other charges the POA contends are owed. Each page of the third amended complaint states, "THIS COMMUNICATION IS FOR THE PURPOSE OF COLLECTING A DEBT. ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE."

Appellants answered the POA's third amended complaint and counterclaimed for conversion, breach of fiduciary duty and bad faith, equitable indemnity, tortious interference with contractual relations, fraud, declaratory relief, self-dealing, negligence, an accounting, and breach of the Restrictive Covenants/breach of contract. Appellants also brought third-party claims against certain current and former directors of the POA. In a nutshell, the counterclaiming Appellants allege improprieties regarding the levying and use of assessments and other charges under the Declaration and POA bylaws.

On July 26, 2022, the POA and Third-Party Defendants moved to dismiss or alternatively for partial summary judgment as to Appellants' counterclaims and third-party claims. A later motion for partial summary judgment as to some of the POA's claims sought: (1) an order that the Subject Lots are subject to and bound by the Restrictive Covenants; (2) an order that Appellants are members of the POA; (3) a monetary award of assessments and associated late charges and interest; and (4) an award of attorney's fees and costs. The POA asserted no genuine issues of material fact exist regarding the following:

> 1. John K. Payne, Ruth G. Payne (the "Paynes") – Lot 1
> a. That the Paynes are the owners of Lot 1 in Chandelle Subdivision.
> b. That Lot 1 is subject to and bound by the Declaration of Covenants, Conditions and Restrictions for Chandelle Subdivision recorded on December 16, 1997, in the Office of the Register of Deeds for Spartanburg County in Book 67-A at Page 0583, as amended and supplemented (as amended and supplemented, the "Declaration").
> c. That the Paynes are members of [the POA].
> d. That the Paynes are delinquent in the payment of assessments to [the POA] and owe [the POA] assessments and associated late charges and interest. [The POA] intends to hereafter file an affidavit setting forth the amount of the debt owed by the Paynes to [the POA].

2. Warren Johnson and Rhonda Johnson (the "Johnsons") – Lots 28, 29, 30 & 34

a. That the Johnsons are the owners of Lots 28, 29, 30 & 34 in Chandelle Subdivision.

b. That Lots 28, 29, 30 & 34 are subject to and bound by the Declaration.

c. That the Johnsons are members of [the POA].

d. That the Johnsons are delinquent in the payment of assessments to [the POA] and owe [the POA] assessments and associated late charges and interest. [The POA] intends to hereafter file an affidavit setting forth the amount of the debt owed by the Johnsons to [the POA].

3. Jane Van Wieren as trustee of the Greer R.G. Irrevocable Property Trust, dated October 25, 2006 ("Van Wieren") – Lots 31, 32, 33, 35, 36, and 37

a. That Van Wieren is the owner of Lots 31, 32, 33, 35, 36, and 37 in Chandelle Subdivision.

b. That Lots 31, 32, 33, 35, 36, and 37 are subject to and bound by the Declaration.

c. That Van Wieren is a member of [the POA].

d. That Van Wieren is delinquent in the payment of assessments to Plaintiff and owes [the POA] assessments and associated late charges and interest. [The POA] intends to hereafter file an affidavit setting forth the amount of the debt owed by Van Wieren to [the POA].

4. James Douglas Armstrong and Jane Armstrong (the "Armstrongs") – Lots 55, 56, and 57

a. That the Armstrongs are the owners of Lots 55, 56, and 57 in Chandelle Subdivision.

b. That Lots 55, 56, and 57 are subject to and bound by the Declaration.

c. That the Armstrongs are members of [the POA].

d. That the Armstrongs are delinquent in the payment of assessments to Plaintiff and owe [the POA] assessments and associated late charges and interest. [The POA] intends to hereafter file an affidavit setting forth the

amount of the debt owed by the Armstrongs to [the POA].

With its supporting memoranda, the POA attached numerous exhibits, including POA President Billy J. Israel, Jr.'s affidavit detailing the amounts owed by Appellants for assessments, late charges, and interest. At the time of this affidavit, Israel had been the POA President and a member of its board of directors continuously since 2010. Regarding assessments levied during his board tenure, Israel affirmed: (1) Appellants John K. Payne and Ruth G. Payne paid all assessments levied by the POA up until 2017, and they also paid a special assessment levied in 2021; however, they have maintained a delinquent balance at all times since 2017; (2) Appellants Warren Johnson and Rhonda Johnson paid all assessments levied by the POA up until 2016; however, they have maintained a delinquent balance at all times since 2016; (3) Appellant Jane Van Wieren (as trustee of the Greer R.G. Irrevocable Property Trust, dated October 25, 2006) paid all assessments levied by the POA up until 2016; however she/the trust has maintained a delinquent balance at all times since 2016; and (4) Appellants James Douglas Armstrong and Jane Armstrong paid all assessments levied by the POA up until 2017, and they also paid a special assessment levied in 2017; however, they have maintained a delinquent balance at all times since 2017.[6]

Following a hearing,[7] the circuit court issued two orders: (1) an October 19, 2022 order denying the POA's and Third-Party Defendants' motion to dismiss or alternatively for partial summary judgment as to Appellants' counterclaims and third-party claims; and (2) an October 29, 2022 order granting, in part, the POA's

[6] Some of the assessments were special assessments, and with respect to Appellant Jane Van Wieren as Trustee, some were assessments for runway use violations.

[7] At this hearing, Appellants conceded they are likely part of the POA under the theory of reciprocal negative easements. However, they argue genuine issues of material fact remain surrounding the claimed back assessments. Appellants contend at least some of the assessments resulted from the POA's violation of the bylaws and Restrictive Covenants in incurring debt greater than $50,000 without the required membership vote; they challenge other annual assessments as improper based on their argument that such assessments are intended for maintenance purposes only. It is important to note that some of the debt Appellants now challenge has accrued over time—in part due to Appellants' own failures to pay their assessments.

motion for partial summary judgment as to its own claims against Appellants for monies due on unpaid assessments.

The circuit court found the Subject Lots were bound by the Restrictive Covenants during the entirety of Appellants' ownership on several different grounds: (1) by express language; (2) by plain and unmistakable implication/reciprocal negative easements; and (3) through the exercise of the court's inherent equitable powers. Additionally, the circuit court found Appellants, by virtue of their ownership of property subject to the Restrictive Covenants, were mandatory members of the POA. The circuit court's order explains that because the Subject Lots are governed by the Restrictive Covenants, Appellants and the Subject Lots are subject to assessments under the POA's governing documents. Although the circuit court found no genuine issue of material fact existed as to the assessments Appellants owe, it found genuine issues of material fact remain regarding interest and/or late fees. Thus, the circuit court granted partial summary judgment to the POA for the back assessments only, exclusive of any late charges and/or interest, as follows:

- Against John K. Payne and Ruth G. Payne – $22,000.00
- Against Warren Johnson and Rhonda Johnson – $24,000.00
- Against Jane Van Wieren as Trustee – $55,250.00
- Against James D. Armstrong and Jane Armstrong – $44,000.00

The circuit court also held in abeyance the POA's request for attorney's fees, finding such fees should be determined at a later date. Appellants filed no Rule 59(e), SCRCP, motions but timely appealed on November 1, 2022.

**Standard of Review**

"In reviewing a grant of summary judgment, our appellate court applies the same standard as the trial court under Rule 56(c), SCRCP." *Woodson v. DLI Props., LLC*, 406 S.C. 517, 528, 753 S.E.2d 428, 434 (2014). Rule 56(c) "provides that the moving party is entitled to summary judgment 'if the [evidence before the court] show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Kitchen Planners, LLC v. Friedman*, 440 S.C. 456, 459, 892 S.E.2d 297, 297 (2023) (alterations by the court) (quoting Rule 56(c), SCRCP). "In determining whether summary judgment is proper, the court must construe all ambiguities, conclusions, and inferences arising from the evidence against the moving party." *Weston v. Kim's Dollar Store*, 399 S.C. 303, 308, 731 S.E.2d 864, 866 (2012) (quoting *Byers v. Westinghouse Elec. Corp.*, 310 S.C. 5, 7, 425 S.E.2d 23, 24 (1992)).

**Analysis**

## I.    Partial Summary Judgment

Appellants contend the circuit court erred in granting partial summary judgment because association bylaws prohibited the POA from incurring debt in excess of $50,000 without a vote of the association, and the Restrictive Covenants allowed annual assessments only for maintenance.  We find the circuit court properly granted partial summary judgment.

"Real covenants have been defined as 'agreement[s] . . . to do, or refrain from doing, certain things with respect to real property.'"  *Queen's Grant II Horizontal Prop. Regime v. Greenwood Dev. Corp.*, 368 S.C. 342, 361, 628 S.E.2d 902, 913 (Ct. App. 2006) (quoting 20 Am.Jur.2d *Covenants, Conditions, and Restrictions* § 1 (2005)).  "Therefore, covenants, 'in a sense are contractual in nature and bind the parties thereto in the same manner as would any other contract.'"  *Id.* (quoting 20 Am.Jur.2d *Covenants, Conditions, and Restrictions* § 1 (2005).  "Restrictive covenants are construed like contracts and may give rise to actions for breach of contract."  *Id.*

"The cardinal rule of contract interpretation is to ascertain and give legal effect to the parties' intentions as determined by the contract language."  *Whitlock v. Stewart Title Guar. Co.*, 399 S.C. 610, 614, 732 S.E.2d 626, 628 (2012) (quoting *McGill v. Moore*, 381 S.C. 179, 185, 672 S.E.2d 571, 574 (2009)).  "Where the contract's language is clear and unambiguous, the language alone determines the contract's force and effect."  *Id.* at 615, 732 S.E.2d at 628 (quoting *McGill*, 381 S.C. at 185, 672 S.E.2d at 574).  "It is a question of law for the court whether the language of a contract is ambiguous."  *Id.* (quoting *McGill*, 381 S.C. at 185, 672 S.E.2d at 574).

Article VIII, Section 8.2(i) of the bylaws provides:

> **Section 8.2. Specific Powers and Duties.**  Without limiting the generality of powers and duties set forth in Section 8.1 above, the Board of Directors shall be empowered and shall have the powers and duties as follows:
>
> . . . .

(i) To borrow funds in order to pay for any expenditure or outlay required pursuant to the authority granted by the provisions of the Declaration and these By-Laws and to authorize the appropriate officers to execute all such instruments evidencing such indebtedness as the Board of Directors may deem necessary; provided, however, that the Board shall not borrow more than Fifty thousand and no/100 ($50,000.00) Dollars or cause the Association to be indebted for more than $50,000.00 at any one time without prior approval of a majority of votes of both classes of membership.

. . . .

The circuit court's partial summary judgment order states:

The Subject Defendants also assert that the Plaintiff, by and through its Board, violated Section 8.2(i) of the Bylaws of Plaintiff by allegedly borrowing more than $50,000.00 or incurring more than $50,000.00 in debt without a vote of its members. While I don't reach the merits of whether there has been any violation of Section 8.2(i) of the Bylaws, I find that even assuming *arguendo* that a violation has occurred, it does not relieve the Subject Defendants of their obligation to pay assessments. Whether a debt was properly incurred is independent of the Subject Defendants' obligation to pay assessments. Even if a debt was improperly incurred by Plaintiff, that debt is still an obligation of the Plaintiff that Plaintiff is liable for. Like most homeowners' associations, Plaintiff's primary means of funding its obligations is through assessments levied against its members. If the Court were to accept the Subject Defendants' argument, it would mean for example that if the Plaintiff were to borrow more than $50,000 without member approval, then Plaintiff could never assess its members to pay off that loan, forcing the Plaintiff to default on the loan and suffer the adverse consequences of a default. I find that such a position cannot be sustained. Rather, if there has been any violation of Section 8.2(i) of the Bylaws, I find that it does not

obviate the Subject Defendants' obligation to pay assessments, without prejudice to whatever rights the Subject Defendants may have, if any, to pursue claims against the Plaintiff or its directors, individually or derivatively, arising out of the alleged violation.

Because the circuit court's ruling was not based upon whether a question of fact exists as to an alleged violation of Section 8.2(i) of the bylaws, we find Appellants' argument here lacks merit. Notably, the circuit court found "even assuming *arguendo* that a violation has occurred, it does not relieve the Subject Defendants of their obligation to pay assessments." We agree with the circuit court that Appellants' allegation of POA violations of Article XIII, Section 8.2(i) is independent of any determination addressing their assessment obligations.

Further, we note Article XI, titled "Maintenance Assessments," includes the following relevant language:

> **Section 11.1. <u>Creation of the Lien and Personal Obligation for Assessments</u>.** Declarant, for each Lot owned within the Property, hereby covenants, and each Owner of any Lot, by acceptance of a deed therefore, whether or not it shall be so expressed in any such deed, is deemed to covenant and agree to pay to the Association:
> a) Annual assessments or charges as provided in this Declaration for the purpose of funding the maintenance fund.
> b) Special assessment for capital improvements and other purposes as stated in this Declaration; such annual and special assessments to be fixed, established and collected from time to time as provided below.
> c) Default assessments which may be assessed against an Owner's Lot pursuant to the Chandelle Documents for failure to perform an obligation under the Chandelle Documents or because the Association has incurred an expense on behalf of the Owner under the Chandelle Documents. The annual, special and default assessments, together with interest, costs and reasonable attorney's fees, shall be a charge upon the land and shall be a continuing lien upon the Lot against which each such

assessment is made until paid. Each such assessment, together with interest, costs and reasonable attorney's fees, shall also be the personal obligation of the Owner of such Lot at the time when the assessment fell due.

**Section 11.2. <u>Purpose of Assessments</u>.** The assessments levied by the Association shall be used exclusively to promote the recreation, health, safety and welfare of the Owners and occupants of Chandelle and for the improvement and maintenance of the Common Areas, including but not limited:

(a) to keep the Common Areas clean and free from debris and to maintain any amenities located thereon in a clean and orderly condition, to maintain the landscaping thereon in accordance with the highest standards for private parks including any necessary removal and replacement of landscaping, and to repair, replace, and provide for additions to the improvements as stated in the Chandelle Documents.

(b) to pay all taxes, if any, levied against the Common Areas and any properties owned by the Association.

(c) to install and maintain any light fixtures along roads and streets in the Development to provide street lighting therefore, as may be approved by the Association.

(d) to erect and maintain entrance signs at the entrances to the Development and signs on the Common Areas, said signs to be of standard construction and quality.

(e) to pay the premiums on all hazard insurance carried by the Association on the Common Areas and all public liability insurance carried by the Association pursuant to the By-Laws.

(f) to provide such security services as may be deemed reasonably necessary for the protection of the Common Areas from theft, vandalism, fire and damage from animals.

(h) to provide such garbage removal services as may be approved by the Association for all Lots.

. . . .

**Section 11.5. <u>Special Assessments</u>.** In addition to the annual assessments authorized in Section 11.1 above, the Board of Directors may levy in any fiscal year one or more special assessments applicable to that year only for the purpose of defraying, in whole or in part, the cost of any construction or reconstruction, repair or replacement of a described capital improvement on the open space or Common Area, including the necessary fixtures and personal property related thereto, or to make up any shortfall in the current year's budget. Notice of the amount and due dates for each special assessment must be sent to each Owner at least (30) days prior to the due date.

. . . .

**Section 11.7. <u>Owner Liability</u>.** No Owner may waive or otherwise exempt himself from liability for the assessments provided for herein, including, by way of illustration, but not limitation, abandonment of the Lot. No diminution or abatement of any assessment shall be claimed or allowed by reason of any alleged failure of the Association to take some action or perform some function required to be taken or performed by the Association under this Declaration or the By-Laws or for inconvenience or discomfort arising from the making of repairs or improvements which are the responsibility of the Association, or from any action taken by the Association to comply with any law, ordinance, or with any order or directive of any municipal or other governmental authority, the obligation to pay assessments being a separate and independent covenant on the part of each Owner.

. . . .

**Section 11.9. <u>Effect of Non-payment of Assessment; Lien; Remedies of Association</u>.** Any Association installment, whether pertaining to an annual, special or default assessment, which is not paid within thirty (30)

days of its due date shall be delinquent. In the event that an assessment installment becomes delinquent, the Association, in its sole discretion may take any or all of the following actions:

(a) Enforce a Late charge as provided in Section 8.2 (h) of the By-Laws.

(b) Assess a late charge of at least 15% per delinquency.

(c) Assess an interest charge from the date of delinquency at the rate per annum of 2 points above the prime rate charged by the Association's bank or such other rate as shall have been established by the Board of Directors.

(d) Suspend the voting rights of the Owner during any period of delinquency.

(e) Accelerate all remaining assessment installments for the fiscal year in question so that unpaid assessments for the remainder of the year shall be due and paid at once.

(h) Bring legal action against any owner personally obligated to pay the delinquent installments.

(i) File a statement of lien with respect to the Lot, and foreclose as set forth *below:*

. . . .

Because a lot owner may not waive or otherwise exempt himself from assessments, the circuit court found Appellants' obligation to pay their assessments exists independently of their disagreement with the POA board's use of assessment funds, its business judgment, or the incurring of more than $50,000 in debt in possible violation of the bylaws. Perhaps more importantly, the POA has the right (and likely the eventual duty) to "[b]ring legal action against any owner personally obligated to pay the delinquent installments" under Section 11.9.

As a nonprofit corporation, the POA is subject to and governed by the South Carolina Nonprofit Corporation Act of 1994 (the NCA).[8, 9] Section 33-31-304 of the NCA, which addresses *ultra vires* actions, provides:

---

[8] S.C. Code Ann. §§ 33-31-101 to -1708 (1976 & Supp. 2023).

[9] Appellants' reliance on *Lovering v. Seabrook Island Property Owners Association*, is misplaced. 289 S.C. 77, 82, 344 S.E.2d 862, 865 (Ct. App. 1986)

## § 33-31-304. Ultra vires.

(a) Except as provided in subsection (b), the validity of corporate action may not be challenged on the ground that the corporation lacks or lacked power to act.

(b) A corporation's power to act may be challenged in a proceeding against the corporation to enjoin an act where a third party has not acquired rights. The proceeding may be brought by the Attorney General, a director, or by a member or members in a derivative proceeding.

(c) A corporation's power to act may be challenged in a proceeding against an incumbent or former director, officer, employee, or agent of the corporation. The proceeding may be brought by a director, the corporation, directly, derivatively, or through a receiver, a trustee, or other legal representative, or in the case of a public benefit corporation, by the Attorney General.

S.C. Code Ann. § 33-31-304 (2006). The Official Comment to Section 33-31-304 states:

> The object of section 3.04 is to do away with the ultra vires doctrine. This long-discredited concept is based on the fiction that third parties dealing with corporations have constructive notice of limitations on corporate purposes and powers appearing in articles of incorporation. In the heyday of the ultra vires doctrine, innocent third persons or not-so-innocent corporations could have corporate acts and contracts declared void or unenforceable on the ground that they were beyond the corporate purposes or that the corporation had no power to enter into the transaction. Ballentine, "Proposed Revision of the Ultra Vires Doctrine," 12 Corn. L.Q. 453 (1927).

_aff'd as modified on other grounds_, 291 S.C. 201, 352 S.E.2d 707 (1987) _overruled on other grounds_ by S.C. Code Ann. § 33-31-302.

S.C. Code Ann. § 33-31-304.  The Official Comment further explains:

> If a corporation has entered into or completed an ultra vires transaction, a proceeding can be brought against the present or former directors, officers, employees, or agents who caused the corporation to act in violation of limitations contained in its articles.  In such a situation a third party who had acquired rights could enforce the ultra vires action even though it violated a specific provision of the articles.  However, a director approving such a contract would be liable if the director breached his or her duty of care or loyalty.  The amount of money damages, if any, for violation of this section is left to the sound discretion of the courts.  Similarly the circumstances in which an injunction will issue is left to judicially developed equitable principles.

S.C. Code Ann. § 33-31-304.  Likewise, the South Carolina Reporters' Comments to section 33-31-304 make clear that once a claimed *ultra vires* transaction has occurred, the challenger's remedy is to pursue an action against the individual or parties who caused the corporation to act in an *ultra vires* manner.

Appellants contend the POA's *ultra vires* act was its exceeding of the debt limit. *See Seabrook Island Prop. Owners Ass'n v. Pelzer*, 292 S.C. 343, 347, 356 S.E.2d 411, 414 (Ct. App. 1987) ("[A] corporation may exercise only those powers which are granted to it by law, by its charter or articles of incorporation, and by any bylaws made pursuant thereto; acts beyond the scope of the powers so granted are ultra vires.").  And, although Appellants do not allege the POA lacks the power to levy assessments against its members, they do challenge the purposes for which the governing documents permit such funds to be used.

It appears Appellants' arguments regarding Section 8.2(i) and the debt limit are circular attempts to justify their own nonpayment of assessments.  Moreover, their argument that the POA cannot use assessments to pay legal fees contradicts Section 11.9(h), which specifically provides the POA may bring legal action for nonpayment of assessments.  Because the POA's only means of funding its obligations is through assessments levied against its members, it stands to reason that the POA may rely on such funds when "[bringing] legal action against any owner personally obligated to pay the delinquent installments."

Additionally, Article XIII, Section 13.9 specifically provides for the recovery of costs and attorney's fees:

> **Section 13.9. <u>Recovery of Costs</u>.**  If legal assistance is obtained to enforce any of the provisions of the Chandelle Documents, or in any legal proceeding (whether or not suit is brought) for damages or for the enforcement of the Chandelle Documents or the restraint of violations of the Chandelle Documents, the prevailing party shall be entitled to recover all costs incurred by it in such action, including reasonable attorney's fees as may be incurred, or if suit is brought, as may be determined by the Court.

In sum, Chandelle's governing documents clearly contemplate that the POA can and will incur attorney's fees.  And, such attorney's fees would fall within the broad purposes for which assessments may be used as set forth in Section 11.2—to "promote the recreation, health, safety and welfare of the Owners and occupants of Chandelle."  For all of these reasons, we affirm the circuit court's order granting partial summary judgment.

## II.    Retroactive Award

Appellants further argue the circuit court erred in retroactively awarding back assessments.  We disagree.

The circuit court found the Lots are subject to and have been bound by the Declaration for at least the entirety of Appellants' ownership for three reasons: (1) the properties were expressly bound by the Declaration; (2) the properties were bound by the Declaration through reciprocal negative easements/unmistakable implication; and (3) the properties were bound by the Declaration through the exercise of the court's inherent equitable powers.

Appellants failed to challenge findings (1) and (3) in their statement of issues on appeal.  *See* Rule 208(b)(1)(B), SCACR ("Ordinarily, no point will be considered which is not set forth in the statement of the issues on appeal."); *but see Herron v. Century BMW*, 395 S.C. 461, 466, 719 S.E.2d 640, 642 (2011) ("When an issue is not specifically set out in the statements of issues, the appellate court may nevertheless consider the issue if it is *reasonably clear* from an appellant's arguments." (emphasis in original)).  Additionally, as the POA properly notes,

"[u]nder the two[-]issue rule, where a decision is based on more than one ground, the appellate court will affirm unless the appellant appeals all grounds because the unappealed ground will become the law of the case." *Skywaves I Corp. v. Branch Banking & Tr. Co.*, 423 S.C. 432, 451, 814 S.E.2d 643, 653–54 (Ct. App. 2018) (quoting *Jones v. Lott*, 387 S.C. 339, 346, 692 S.E.2d 900, 903 (2010)).

Because Appellants did not appeal findings (1) and (3), we affirm the circuit court's finding that the Subject Lots have been subject to and bound by the Declaration for the entirety of their ownership. However, even if the two-issue rule did not apply, Appellants have conceded the Subject Lots are bound by the Declaration via the doctrine of reciprocal negative easements. It is further undisputed that Appellants took title to their properties after CSC Developers recorded the Declaration and common scheme of development and that Appellants were aware the Declaration would govern the Association. There is no dispute that the challenged assessments were levied after such time. Thus, we find the circuit court did not "retroactively" award anything, and we affirm on this point as well.

### III.    Debt Collection Action and Timing of Claims

Appellants next argue the circuit court erred in entering judgment on the claimed debts through "equitable action" prior to a jury's consideration of their compulsory legal counterclaims and failed to require the POA to exhaust other legal remedies before entering judgment for the assessments owed. We disagree.

Initially, it appears Appellants have abandoned their exhaustion theory by providing only a summary argument. *See* Rule 208(b)(1)(D), SCACR (requiring "discussion and citations of authority" for each issue in an appellant's brief); *see also Glasscock, Inc. v. U.S. Fid. & Guar. Co.*, 348 S.C. 76, 81, 557 S.E.2d 689, 691 (Ct. App. 2001) ("South Carolina law clearly states that short, conclusory statements made without supporting authority are deemed abandoned on appeal and therefore not presented for review."). More significantly, Appellants failed to raise this question to the circuit court. *See Staubes v. City of Folly Beach*, 339 S.C. 406, 412, 529 S.E.2d 543, 546 (2000) ("It is well-settled that an issue cannot be raised for the first time on appeal, but must have been raised to and ruled upon by the trial court to be preserved for appellate review."). In any event, for the reasons discussed in Sections I and II, we find the circuit court properly awarded partial

summary judgment to the POA as to the assessments owed based on the language of the governing documents.[10]

In a related argument, Appellants cite *Johnson v. South Carolina National Bank*, 292 S.C. 51, 55–56, 354 S.E.2d 895, 897 (1987), for the proposition that they are entitled to have a jury hear their compulsory counterclaims before any equitable claims related to implied covenants may be resolved. But *Johnson* cannot be construed as prohibiting summary judgment when otherwise proper simply because a defendant has asserted a legal counterclaim. *See, e.g.*, *SSI Med. Servs., Inc. v. Cox*, 301 S.C. 493, 502, 392 S.E.2d 789, 794 (1990) (explaining "when summary judgment for the plaintiff on its claim is otherwise appropriate, we view it as proper to grant the motion" despite the presence of a counterclaim).

## IV.   Discovery

Appellants also challenge the award of back assessments as premature based on their contention that discovery was not yet complete. We find no error on this point.

Appellants assert that at the time of the circuit court's summary judgment hearing, the deposition of the POA's relatively new Treasurer, Jeff Cooper, had been scheduled but cancelled. They argue in their brief to this court that:

> Jeff Cooper's deposition was taken after the hearing and revealed that the Association was still in debt to its lawyers in the approximate amount of $166,000.00. This fact would have given Appellants more conclusive evidence that the Plaintiff and Board Members violated the prohibitions of the By-Laws prior to the institution of the lawsuit and had continued to violate the prohibitions of the By-Laws throughout the entire lawsuit. This fact would have also lent more credence to the Appellants' equitable defense of unclean hands and equitable estoppel.

(internal citation omitted).

---

[10] We further note it is unclear what legal remedies Appellants are referencing in arguing the circuit court committed an error of law by failing "to require [the POA] to exhaust its legal remedies before awarding the money damages."

In addressing Appellants' contention that the Cooper deposition provides evidence of the alleged bylaws violations, we again note the circuit court's awarding of the unpaid assessments was independent of any consideration of whether there has been a POA violation of Article VIII, Section 8.2. The circuit court found "even assuming *arguendo* that a violation has occurred, it does not relieve the Subject Defendants of their obligation to pay assessments." Although it remains to be seen whether Cooper's deposition creates a question of material fact as to the claimed violations, this does not affect the circuit court's rulings on the assessments owed. Accordingly, we find the circuit court's grant of partial summary judgment was neither premature nor otherwise erroneous.

## V.    Attorney's Fees

Finally, Appellants argue the circuit court erred in failing to recognize the claimed back assessments are "ostensibly attorney's fees" in disguise, and disregarded the requirements of *Jackson v. Speed*, 326 S.C. 289, 307-08, 486 S.E.2d 750, 759-60 (1997) (setting out factors for determining a reasonable attorney's fee).

It is undisputed that the POA has incurred attorney's fees—including those related to this lawsuit—and that some portion of the $145,250.00 in assessments awarded would likely help pay such expenses. However, the circuit court did not "award attorney's fees" such that a review of the *Jackson* factors was required. The circuit court's award was for unpaid assessments. It held the question of attorney's fees in abeyance for consideration at a later date.

## Conclusion

For these reasons, the circuit court's order granting partial summary judgment is

**AFFIRMED.**

**THOMAS, J., and VERDIN, A.J., concur.**